249 N.J. Super. 144 (1991)
591 A.2d 1382
STATE OF NEW JERSEY, PLAINTIFF,
v.
ROD SORGE, BRAD TAYLOR, CARL SIGMON AND JON PARKER, DEFENDANTS.
Superior Court of New Jersey, Law Division Hudson County.
Decided April 26, 1991.
*145 Nancy Appel for plaintiff (Paul DePascale, Prosecutor of Hudson County, attorney).
Brian J. Neary for defendants.
D'ITALIA, J.S.C.
Defendants in this case are activists in a movement which seeks to promote the distribution of clean hypodermic needles to intravenous drug users in exchange for dirty needles. The stated goal of this exercise is to help stem the spread of the human immuno-deficiency virus (HIV) that causes AIDS (Acquired Immuno-Deficiency Syndrome). Defendants sought to distribute needles to intravenous drug users in downtown Jersey City on the morning of April 19, 1990. They positioned themselves at a table at a public intersection prepared to exchange clean needles in return for dirty ones which would be *146 placed in biohazardous waste containers. Defendants intended to distribute with each clean needle a packet containing bleach and written instructions on how to clean drug paraphernalia. Defendants publicized their intended activity so as to test whether the Jersey City police would interfere with the exchange program, which on its face constitutes a disorderly persons offense under N.J.S.A. 2C:36-6, or would permit their activity to go unchallenged. Defendants were arrested and charged with the disorderly persons offense.
The matter is before the court on a motion to dismiss pursuant to N.J.S.A. 2C:2-11. That statute provides in pertinent part that:
The assignment judge may dismiss a prosecution if, having regard to the nature of the conduct charged to constitute an offense and the nature of the attendant circumstances, it finds that the defendant's conduct...
....
(b) did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or
(c) presents such other extenuations that it cannot reasonably be regarded as envisaged by the Legislature in forbidding the offense....
Defendants are charged with violating N.J.S.A. 2C:36-6. It provides:
Except as otherwise provided by law, it shall be unlawful for a person to have under his control or possess with intent to use a hypodermic syringe, hypodermic needle, or any other instrument adapted for the use of a controlled dangerous substance ... or to sell, furnish or give to any person such syringe, needle or instrument....
Defendants argue that their conduct did not actually cause or threaten the harm sought to be prevented by the statute barring possession or distribution of hypodermic needles. They argue further that their needle exchange activity constitutes an extenuating circumstance which could not reasonably have been envisaged by the Legislature in defining the offense.
At the heart of defendants' motion is their contention that exchanging clean needles for ones possibly infected with HIV is a significant method of combatting the spread of AIDS while *147 contributing minimally, if at all, to the social ills associated with illegal drug use. Defendants point out that drug users represent an extremely high-risk population for the transmission of HIV. Intravenous drug users employ hypodermic syringes and needles to inject themselves with the drug of choice. This equipment is not generally available because of the law banning possession for use in connection with controlled dangerous substances. As a consequence, users share needles. Sometimes these needles are provided by drug dealers. This sharing entails an extremely high risk of transmitting the AIDS virus from an HIV positive user to one not previously infected if the needle is not cleaned properly. Knowledge about the risks of needle-sharing and the techniques of cleaning drug paraphernalia is lacking in the drug-abusing community.
Needle exchange programs, according to defendants, serve the laudatory purpose of removing dirty and possibly HIV-infected needles from the community, thereby helping in the battle against the AIDS epidemic. While clean needles are introduced into the drug-abusing population, the exchange program is a vehicle to disseminate information regarding proper cleaning techniques and educational information regarding AIDS and drug abuse generally. Defendants say that these salutary purposes either were not considered by the Legislature when it criminalized hypodermic needle possession or that possession and dissemination of needles in connection with the needle exchange program, since it does not actually cause or threaten the evil sought to be prevented, or does so only to a trivial extent, warrant the dismissal of the charges.
Defendants' reliance on N.J.S.A. 2C:2-11 is misplaced. That statute, as its headnote states, deals with "de minimis infractions,"[1] meaning conduct which is so trivial or which *148 presents such extenuations that in all reason, it ought not to be prosecuted. The touchstone for dismissal under the statute is the prevention of absurd applications of the Criminal Code. The commentary provided by the Criminal Law Revision Commission supports this view:
This Section of the Code introduces a new idea into the substantive criminal law. It is MPC § 2.12. In criminal law enforcement, many agencies exercise discretion as to the appropriateness of prosecution in a particular case. The police constantly must make decisions as to whether to arrest or, after arrest, whether to proceed with the case. Thereafter, both the prosecutor and the Grand Jury are charged with the obligation of determining both the sufficiency of the evidence to proceed and the appropriateness of doing so. Further, at least as to the Municipal Courts, experience has shown that judges will, on occasion, enter a finding of not guilty even in the face of proven guilt because, under the circumstances, a conviction is considered to be inappropriate.
The drafters of the MPC summarize all of this as a "kind of unarticulated authority to mitigate the general provisions of the criminal law to prevent absurd applications." In order to bring this exercise of discretion to the surface and to be sure that it is exercised uniformly throughout the judicial system, this Section of the Code has been included. .. . [The New Jersey Penal Code, Final Report of the Criminal Law Revision Commission (1971), vol. II, Commentary at 74.]
There is nothing absurd about the application of N.J.S.A. 2C:36-6 to these defendants. Neither can their conduct be deemed trivial. Triviality is determined by the degree of public risk posed by defendants' conduct. The question to be answered in response to a de minimis motion is "What is the risk of harm to which society is exposed by defendants' conduct?" State v. Zarrilli, 216 N.J. Super. 231, 239, 523 A.2d 284 (Law Div. 1987), aff'd 220 N.J. Super. 517, 532 A.2d 1131 (App.Div. 1987). Defendants' conduct is not akin to stealing three pieces of bubble gum, as in State v. Smith, 195 N.J. Super. 468, 480 A.2d 236 (Law Div. 1984), or taking fruit from a buffet, as in State v. Nevens, 197 N.J. Super. 531, 485 A.2d 345 (Law Div. 1984), or the case of a minor taking one sip of beer from the cup of a friend, State v. Zarrilli, supra. Defendants, albeit for the highest motives, were engaged in facilitating illegal drug use. Whatever social benefits may have attended defendants' plan in terms of minimizing the transmission of HIV in the community, defendants were exacerbating the social costs associated *149 with the illegal drug trade. That is contrary to the zero tolerance drug policy of this State which refuses to treat as trivial the possession of even the most minuscule amounts of a controlled dangerous substance. State v. Ziegler, 226 N.J. Super. 504, 544 A.2d 914 (Law Div. 1988); State v. Brown, supra. See Discussion Paper, "Supreme Court Task Force on Drugs and the Courts," (1990) at 1.
Moreover, defendants' conduct is not a mere technical violation, an isolated transgression, such that no deterrent purpose is served by their prosecution or conviction. On the contrary, defendants' conduct was intended to postulate a test case, the grant of defendants' motion constituting a declaratory judgment exempting needle exchange programs from the application of N.J.S.A. 2C:36-6. A determination in defendants' favor would amount to a judicial license for defendants and others to embark on a course of conduct with significant law enforcement and public health implications.
The proscription against unauthorized control or possession of hypodermic needles in New Jersey has existed for almost four decades. N.J.S.A. 2C:36-6 is a successor to N.J.S. 24:21-51. The latter statute had its genesis in N.J.S.A. 2A:170-77.1 which was enacted by L. 1952, c. 209, § 1. It has indisputably been considered by successive Legislatures as an important weapon in the struggle against the social evils associated with drug abuse. Defendants would have this court conclude that needle exchange programs do not cause the harm sought to be prevented by N.J.S.A. 2C:36-6 or do so to only a trivial degree, and that the benefits of such programs outweigh whatever harm they might cause.
First, defendants' contentions regarding the alleged ameliorative impact of needle exchange programs on illegal drug use are not supported by any evidence in the record. Citations to an assortment of literature regarding the experience in such jurisdictions as permit the activity are not a substitute for competent proof. Neither are defendants' contentions self-evident. *150 On the contrary, it is reasonable to conclude that supplying clean needles and teaching techniques for needle cleaning actively promote and encourage drug abuse. By facilitating the availability of clean, risk-free paraphernalia, intravenous drug use may be encouraged among addicts who might otherwise avoid the risks associated with that modality of drug abuse. As stated by one author:
Users probably would share less if needles were readily and legally available, but there is also evidence that in the heroin using culture, needle sharing has social values independent of its practicality. Making needles easier to get could lead some persons who currently smoke, swallow, or snort drugs other than heroin to begin to use them intravenously, even if it did not dramatically lower the barriers to heroin use per se. This would increase those persons' risk of acquiring AIDS and other ill effects of IV drug use. [Kleinman, "AIDS, Vice and Public Policy," 51 Law and Contemporary Problems 315, 362 (1988)]
The fact is that the benefit of needle exchange programs remains a subject for debate. As reported by the Committee on Medicine and Law of the Association of the Bar of the City of New York:
While the connection between the use of "dirty" needles and the transmission of the HTLV-III virus is clear, there is no consensus that the ready availability of sterile needles will in fact lessen the sharing of needles among drug users. Opponents to the legalization of over-the-counter sales of needles contend that needle sharing among drug users is ingrained social behavior, integral to the addict subculture, that will not be modified even in the face of the AIDS epidemic and the ready availability of sterile needles....
The literature does indeed reflect that the sharing of needles among addicts serves certain psychological or emotional functions that go beyond simple economy or convenience. In addition, needle-sharing has persisted in the past despite clear evidence of other health risks associated with the practice, such as hepatitis.... ["Legalization of Non-Prescription Sale of Hypodermic Needles: A Response to the AIDS Crisis," 41 The Record of the Assoc. of the Bar of the City of New York 809, 812 (1986)]
The committee also notes the problematic impact of free needles on the spread of addiction. Id. at 814-815. It does conclude, however, that the New York law prohibiting over-the-counter purchase of needles "is largely symbolic and no longer serves a purpose that can be justified...." Id. at 817.
The clear policy of this State is to discourage illegal drug use. To say that the State has launched a war on drugs is not *151 hyperbole. In enacting the Comprehensive Drug Reform Act of 1986, N.J.S.A. 2C:35-1 et seq., the Legislature specifically found that,
Despite the impressive efforts and gains of our law enforcement agencies, the unlawful use, manufacture and distribution of controlled dangerous substances continues to pose a serious and pervasive threat to the health, safety and welfare of the citizens of this state. New Jersey continues to experience an unacceptably high rate of drug-related crime, and continues to serve as a conduit for the illegal trafficking of drugs to and from other jurisdictions. In addition to the harm suffered by the victims of drug abuse and drug-related crime, the incidence of such offenses is directly related to the rate of other violent and non-violent crimes, including murder, assault, robbery, theft, burglary and organized criminal activities. For this reason, enhanced and coordinated efforts designed specifically to curtail drug-related offenses will lead inexorably to a reduction in the rate of crime generally, and is therefore decidedly in the public interest. [N.J.S.A. 2C:35-1.1(b)]
While the act provides for differentiated punishment of offenders based upon the seriousness of the offense, N.J.S.A. 2C:35-1.1(c), there is no license, express or implied, for the activity engaged in by defendants.
Defendants would have this court balance such social harm as may be engendered by needle exchanges against the social benefits to be gained in the struggle against AIDS. Such balancing is quintessentially a legislative function. It requires a balancing of competing social interests after a careful evaluation of data. It may very well be that the AIDS epidemic has reached such proportions that it makes more sense to sacrifice a relatively ineffectual weapon in the war on drugs to achieve quantum success in the war against AIDS. The court is simply not the place for that balance to be struck, given the extensive policy declarations by the Legislature with respect to the evils of drug abuse and drug-related crime. Even assuming, arguendo, that needle exchange programs constitute a net social benefit, it is unlikely that they should be authorized without rules and regulations to assure their integrity and accountability to public health or other executive branch officials. Connecticut, for example, recently amended its general statutes to provide for a demonstration needle exchange program conducted under the auspices of the Department of Health Service. *152 Conn. Gen. Stat. § 21a-65 (1978), as amended by Conn. Acts No. 90-214 (Reg.Sess. 1990).
Although the focus of analysis has been on the concept of triviality, which is explicit in N.J.S.A. 2C:2-11(b), defendants' position is not improved by reliance on the extenuation language of subsection (c). That subsection, like subsection (b), must also be understood to incorporate the concepts of triviality and absurdity. That conclusion follows from the commission Commentary with respect to these subsections:
Subsection b is the situation where the conduct literally comes within the Section as drafted but only to an extent which is too trivial to warrant the condemnation of a conviction. Attributing common sense to the Legislature, it would not have intended the prosecution of every single instance even though there is a technical violation of the statute.

Subsection c applies to a similar situation where there are extraordinary and unanticipated mitigations for the particular conduct. This statute would allow the judiciary to use a rule of reason which, without a legislative recognition of such power, a court might feel that it would be precluded from using by the separation of powers doctrine.... [The New Jersey Penal Code, op. cit., supra at 74-75]
An extenuation, as defined in Webster's Third New International Dictionary of the English Language, (unabridged 1986), is a "partial justification," "a partial excuse." In the context of subsection (c), then, it means an excusing or justifying circumstance which was, in all reason, not envisaged by the Legislature in defining the offense. It may be, as defendants contend, that the Legislature did not explicitly consider the relationship between the restrictions of N.J.S.A. 2C:36-6 and AIDS. Nonetheless, it cannot be concluded that a program of exchanging clean needles for possibly infected ones is such an extraordinary and unanticipated mitigation that it clearly would have been exempted by the Legislature had the idea occurred to it. How to strike a balance between the twin scourges of drug abuse and AIDS is a subject about which reasonable minds may differ. Accordingly, despite the horrific spread of AIDS, defendants' conduct is not trivial and their prosecution not absurd in the circumstances. Defendants' motion is denied.
NOTES
[1] Since the headnote was enacted along with the text of the statute, it is a proper matter for consideration in ascertaining legislative intent. State v. Brown, 188 N.J. Super. 656, 458 A.2d 165 (Law Div. 1983).