*129 OPINION OF THE COURT
Laura E. Drager, J.
Defendants were each charged with one count of criminally possessing a hypodermic instrument (Penal Law § 220.45). After a nonjury trial, this court reserved decision on its verdict.
At trial, the People presented evidence (by stipulation) that on March 6, 1990 at approximately 12:10 p.m. each defendant knowingly possessed hypodermic instruments and that no defendant had a prescription or any personal medical reason for possession of the needles.
It was further stipulated that Captain Frey of the Midtown South Task Force and several dozen officers were at Essex and Delancey Streets at that time in anticipation of the defendants’ arrival to distribute hypodermic needles to other people. The police learned of the defendants’ plan from a News-day article dated March 2, 1990. The defendants were arrested on March 6th as they set up a table and removed hypodermic needles from a box. The arrests occurred within one minute of the instruments being observed in public. Captain Frey never observed anyone receive a hypodermic needle from the defendants, nor exchange a used one for a new needle.
The defendants admit to their knowing possession of the hypodermic instruments. They argue, however, that their possession of the needles was justified and, therefore, lawful.
The defendants contend that they were engaged in a needle exchange program justified by the exigencies created by the AIDS epidemic. By providing clean needles to drug addicts, coupled with health care counseling, the defendants argue they were helping to prevent the spread of HIV infection, thereby saving lives. They claim that their actions fall squarely within the provisions of the "necessity” justification defense (Penal Law § 35.05 [2]; see, infra).
In support of their contention, the defendants presented seven witnesses, including public officials, health care experts and community activists. In addition, each defendant testified.
DISCUSSION
The defendants admit to their knowing possession of hypodermic needles on March 6th but claim their possession of the needles was justified and, therefore, not unlawful. The defendants rely on the "necessity” provision of the justification statute.
*130 Penal Law § 35.05 reads as follows:
"conduct which would otherwise constitute an offense is justifiable and not criminal when * * *
"(2) Such conduct is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor, and which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding such injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue. The necessity and justifiability of such conduct may not rest upon considerations pertaining only to the morality and advisability of the statute, either in its general application or with respect to its application to a particular class of cases arising thereunder.”
Application of the necessity defense to preserve the physical well-being of an individual or group of individuals is well recognized. This is true even under the strict New York statute. The drafters of that provision gave as an acceptable example of the use of the defense as "forcibly confining a person ill with a highly contagious disease for the purpose of preventing him from going to a city and possibly starting an epidemic.” (Commn Staff Notes, reprinted in Proposed NY Penal Law [Study Bill, 1964 Senate Int 3918, Assembly Int 5376], § 65.00, at 317; Commn Staff Notes, reprinted in McKinney’s Cons Laws of NY, Rev Penal Law [1967], art 35, at 258.)
Historically, the defense was found at common law applicable in a number of circumstances involving the physical well-being of those concerned (see, 1 LaFave and Scott, Substantive Criminal Law, § 5.4, at 631-632). From these roots there has evolved in recent cases what has come to be known as the medical necessity defense.
Thus, a District of Columbia Superior Court acquitted a glaucoma sufferer of the charge of possession of marihuana where the defendant established that smoking marihuana eased his condition. (United States v Randall, 104 Daily Wash L Rep 2249 [DC Super Ct, Nov. 29, 1976].) The court found the defendant had not caused his medical condition and that no other treatment options existed due to defendant’s intolerance to other available medication and the risk of complete blindness if he had an operation.
The third limitation to the defense, noted by the court, i.e., *131 whether there was less harm in violating the marihuana possession statute than in defendant’s use of marihuana, presented a more difficult issue to the court. The court ultimately found, relying on medical evidence, that any harm caused by defendant’s marihuana use was speculative. Significantly, studies sponsored by the United States Government as well as studies in other countries suggested that appropriate medical uses of marihuana exist.
Other courts have reached the same conclusion. In State v Diana (24 Wash App 908, 604 P2d 1312 [1979]) the court remanded the case to give defendant the opportunity to demonstrate the alleged beneficial effect of marihuana to treat his multiple sclerosis symptoms. The court held: "medical necessity exists in this case if the court finds that (1) the defendant reasonably believed his use of marijuana was necessary to minimize the effects of multiple sclerosis; (2) the benefits derived from its use are greater than the harm sought to be prevented by the controlled substances law; and (3) no drug is as effective in minimizing the effects of the disease. To support the defendant’s assertion that he reasonably believed his actions were necessary to protect his health, corroborating medical testimony is required. In reaching its decision, the court must balance the defendant’s interest in preserving his health against the state’s interest in regulating the drug involved.” (24 Wash App, supra, at 916, 604 P2d, supra, at 1317; see also, State v Bachman, 61 Haw 71, 595 P2d 287, 288 [1979]; cf., State v Tate, 102 NJ 64, 505 A2d 941 [1986]; United States v Richardson, 588 F2d 1235 [9th Cir 1978].)
An important limitation to a claimed necessity defense is that a defendant may not rely upon it if the Legislature has acted on the very issue raised by the defense. In State v Tate (supra), the Supreme Court of New Jersey, in rejecting a medical necessity defense for the use of marihuana by a quadriplegic found that New Jersey statutes had already contemplated medical use of marihuana and had provided for limited experimental medical testing of these properties. The Legislature having made this specific policy determination, precluded defendant from raising a medical necessity defense.
The New York statute, as previously noted provides the further limitation that the defense "may not rest upon considerations pertaining only to the morality and advisability of the statute,” with which the defendant is charged with violating. (Penal Law § 35.05 [2].) "[T]he necessity defense cannot be used to 'excuse criminal activity intended to express the *132 protestor’s disagreement with positions reached by the lawmaking branches of the government.’ (United States v Dorrell [758 F2d 427, 432 (9th Cir 1985)].) It is not for the courts to decide if an appropriate decision was made by the legislative or executive branches, among competing policy options. To extend the defense this far would violate the principle of separation of powers.” (People v Alderson, 144 Misc 2d 133, 143 [Crim Ct, NY County 1989].)
Typically, the defense has been rejected where protesters demonstrated against existing enacted policies. In People v Chachere (104 Misc 2d 521 [Dist Ct, Suffolk County 1980]) the defendant was charged with trespassing as the result of a protest action at the Shoreham Nuclear Power Plant. Defendant claimed his action was necessary to stop work on the project because of construction defects. The court rejected defendant’s justification defense: "There’s no question that the defendant sincerely believed both morally and factually that the criminal act he committed would prevent a more serious harm to the public * * * [B]ut it is well-founded law that a moral conviction (no matter how strong), without the support of substantive and probative evidence is not enough to bring section 35.05 of the Penal Law into play. If that were the case, anarchy would prevail. Each of us could claim justification for criminal acts when we had strong moral convictions that our cause was just.” (104 Misc 2d, supra, at 524; see also, United States v Kroncke, 459 F2d 697 [8th Cir 1972] [Vietnam War draft protest]; City of St. Louis v Klocker, 637 SW2d 174 [Mo Ct App 1982] [abortion clinic protest]; State v Dorsey, 118 NH 844, 395 A2d 855 [1978] [nuclear power site trespass]; United States v Seward, 687 F2d 1270 [10th Cir 1982] [nuclear power site trespass]; People v Hubbard, 115 Mich App 73, 320 NW2d 294 [1982] [nuclear power plant protest]; State v Diener, 706 SW2d 582 [Mo Ct App 1986] [nuclear power plant protest].)
Taking into consideration all of these factors, this court finds that under New York law a medical necessity defense requires the following: (1) the defendant acted under a reasonable belief, supported by medical evidence, that his or her action was necessary as an emergency measure to avert an imminent public or private injury; (2) the defendant’s actions did not create the crisis; (3) it is clearly more desirable to avoid the public or private injury than the injury caused by violating the statute; (4) there are no available options; and (5) prior legislative action does not preclude the defense and *133 defendant’s actions are not based only upon considerations of the morality and advisability of the statute violated.
Turning to the facts in this case, this court finds it was reasonable for the defendants to believe their action necessary as an emergency measure to avert an imminent public injury. Without doubt, AIDS has created an imminent crisis in New York City. There is no dispute that use of clean needles by addicts prevents the spread of HIV infection. The defendants presented significant expert medical and public health witnesses who testified that needle exchange programs have proven successful as a means of providing addicts with clean needles which addicts will use.
The witnesses further testified that addicts are either aware of or can be educated to the fact that needle sharing spreads the virus. Although studies in this area are limited, defense witnesses claimed the available evidence suggests addicts will not continue to share needles if they know they have a source for clean ones. Moreover, the witnesses testified that there is no reason to believe needle exchange programs encourage people to use drugs.
Most significantly, when coupled with AIDS education and counseling, a needle exchange program serves as a means for convincing addicts to avoid other risk-related behavior, to get medical care and ultimately to discontinue use of drugs.
Others may not agree with this approach. The People’s witness suggests that not enough is known about the long-term effects of a needle exchange program on the community and that, in any event, such a program is merely a band-aid solution. Without fundamental societal changes such as providing increased job opportunities and better education, AIDS will remain just one of a myriad of problems facing the poorer communities of this City.
There is much validity to Dr. Brown’s contentions. However, the issue before this court is not to choose between the different policy options offered by the witnesses, nor is it necessary for defendants’ efforts to be proven successful. Rather, the court must find whether it was reasonable for the defendants, relying on competent medical evidence, to engage in the conduct at issue. While defendants’ actions alone would not end the epidemic, it is reasonable to believe their actions served to avert further risks of infection for some individuals. This court is satisfied that the nature of the crisis facing this City, coupled with the medical evidence offered, warranted defendants’ action.
*134 Obviously, the defendants themselves did not create the crisis. Although some might argue that addicts have brought this scourge upon themselves, that would not preclude the defendants from trying to help the addicts or to help prevent the spread of the disease by the addicts to unsuspecting sex partners or unborn children.
This court is also satisfied that the harm the defendants sought to avoid was greater than the harm in violating the statute. Hundreds of thousands of lives are at stake in the AIDS epidemic. The crime of possessing a hypodermic needle was enacted as a weapon in the war on drugs. Although law enforcement officials believe the statute essential in this fight, available evidence suggests it has had limited success. As the testimony revealed, only 11 States have statutes similar to New York’s law. Despite these statutes, these States — and New York in particular — have among the highest rates of addiction and there are still plenty of dirty needles available. (Legislation of Non-Prescription Sale of Hypodermic Needles: A Response to the AIDS Crisis, Comm on Medicine and Law, 41 Record of Assn of B of City of NY 809 [1986].) The defendants did not violate the drug possession laws. Rather, they violated a law that has been of limited, if any, success in preventing illegal drug use.
The distinction, in broadest terms, during this age of the AIDS crisis is death by using dirty needles versus drug addition by using clean needles. The defendants’ actions sought to avoid the greater harm.
It is equally apparent that there were no meaningful available options. As the evidence revealed, insufficient drug programs exist for the number of addicts in New York and there is no reason to believe more treatment slots will come into existence in the near future. Moreover, many addicts are not willing or able to face the need for full scale treatment and withdrawal from drugs. Providing counseling or bleach kits only would not be as direct or successful an approach. Defendants’ action was not hastily considered and occurred only after the City shut its own needle exchange program.
No legislative or executive action precludes the necessity defense in this case. The hypodermic possession statute and the related public health law provision were enacted to fight drug usage well before the onset of the AIDS crisis.* The State *135 Legislature has yet to consider whether to revise the hypodermic possession statute in the wake of the epidemic. Although efforts to repeal or amend the law have not been successful, without a specific vote based on consideration of the AIDS epidemic, this court cannot find legislative action to have precluded the defense in this case. (Cf., State v Tate, 102 NJ 64, 505 A2d 941, supra.)
Moreover, as one of the defendants testified, the government has given mixed signals on whether it approves or disapproves the idea of a needle exchange program (Williams). The City Department of Health ran its program for over a year despite a vote by the City Council disapproving the concept. The City ended its program without, apparently, any clear reason being given. Police action against the defendants has, at best, been sporadic. Thus, neither legislative nor executive action precludes the defense.
Finally, the People vociferously argue that defendants’ action on March 6, 1990 was in fact a demonstration to support repeal of the hypodermic possession statute. The People point to the crowd of sympathizers, the demonstration signs and the press coverage. Knowing there would be a crowd, the People argue that defendants had no expectation that they would be able to give out needles and that, therefore, the action was one of civil disobedience to object to the statute.
Although on March 6th some of the defendants sought to demonstrate the need for legalized needle exchange programs, that was not their sole purpose. Rather, the evidence suggests the defendants’ goal on that date was to give out clean needles. While the crowd and press may have had a chilling effect on that effort, the defendants hoped that after the crowd dissipated the needle exchange could continue. Since the arrests occurred within moments of the defendants’ arrival, there is no way of knowing what would have happened. The New York statute does not prohibit any demonstration aspect to a necessity defense; it merely states that the defendants’ conduct cannot rest only upon considerations of the advisability of the statute violated.
The circumstances here were very different from that of the typical political demonstration case in which the necessity defense is precluded. In those cases protestors generally violate an unrelated law, such as trespass, to engage in an act of conscientious objection to a given policy. It cannot reasonably be believed that the act of trespass will accomplish a change *136 of policy and cannot, therefore, be said to avert an emergency. (See, People v Alderson, 144 Misc 2d 133, supra; People v King, Crim Ct, NY County, Nov. 1, 1990 [docket No. 90N005389].) But here, by violating the substantive crime of criminally possessing a hypodermic needle, the defendants directly advanced their purpose of providing clean needles to addicts to help avert further HIV infections. This court is satisfied that defendants’ conduct was not one of mere protest against a statute but was intended to help avert a very real emergency.
In sum, defendants’ conduct falls within the standards of the medical necessity defense. However, this court feels compelled to instill a cautionary note. A criminal case is premised on particular facts occurring on a past date. It is not the function of this court to set policy. The Randall court noted that its decision was limited to a particular individual’s use of marihuana which even if repeated, would recur in the same manner each time. That is not the case here.
The events of March 6th were limited. The defendants never gave out needles on that date and so this court did not have to judge the defendants’ actual conduct during a needle exchange. This court ultimately relied on the defendants’ prior and subsequent conduct to understand their intent on March 6th. But had particular conduct of a needle exchange been presented, this court might have been compelled to reach a different result. It is conceivable that the defendants, in their zeal, might overstep the bounds of the necessity defense. And, of course, this decision is not binding on any other court. Ultimately, the issue of whether to authorize needle exchange programs or whether to repeal or modify the hypodermic possession statute are questions to be decided by the legislative and executive branches of our government.
That having been said, for the reasons set forth in this decision, with respect to the one count of criminally possessing a hypodermic needle, this court finds each of the defendants not guilty.

 Both statutes were originally enacted shortly after the turn of the century (1905 and 1909 respectively).