714 A.2d 937

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. DIANA MCCAGUE AND THOMAS SCOZZARE,
DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued May 26, 1998—Decided July 23, 1998.

Before Judges HAVEY, LANDAU and COLLESTER.

*Alan Silber* argued the cause for appellant Diana McCague (*Hayden and Silber,* and *Busch and Busch,* attorneys; *Mr. Silber, Ronald J. Busch, Joseph M. Grace* and *Kelly A. Smith,* on the brief).

*Ronald J. Busch* argued the cause for appellant Thomas Scozzare (*Busch and Busch,* and *Hayden and Silber,* attorneys; *Mr. Busch, Alan J. Silber, Joseph M. Grace* and *Kelly A. Smith,* on the brief).

*William F. Lamb*, Assistant Prosecutor, argued the cause for respondent (*Robert W. Gluck*, Middlesex County Prosecutor, attorney; *Ronald G. Kercado*, Assistant Prosecutor, of counsel).

The opinion of the court was delivered by

COLLESTER, J.A.D. (temporarily assigned).

Defendants Diana McCague and Thomas Scozzare appeal their conviction for violation of *N.J.S.A.* 2C:36–6, furnishing or giving a hypodermic needle or syringe to another, on *de novo* appeal to the Law Division from their convictions of the same disorderly persons statute in the New Brunswick Municipal Court. Defendants argue:

POINT I—OPERATION OF A BONA FIDE NEEDLE EXCHANGE PROGRAM IS CONDUCT WITHOUT FAULT OR CRIMINAL PURPOSE, WHICH DOES NOT INFLICT OR THREATEN SERIOUS HARM, AND WAS DONE JUSTIFIABLY AND EXCUSABLY TO REDUCE HIV INFECTION.

POINT II—DEFENDANTS MUST BE ACQUITTED BECAUSE OF THE DOCTRINE OF MEDICAL NECESSITY [*N.J.S.A.* 2C:3–2a].

POINT III—ENFORCEMENT OF *N.J.S.A.* 2C:36–6 "AS APPLIED" VIOLATES THE NEEDLE EXCHANGE PARTICIPANTS' FUNDAMENTAL RIGHT TO LIFE UNDER THE UNTIED STATES AND NEW JERSEY CONSTITUTIONS.

POINT IV—DUE PROCESS (LACK OF NOTICE) AND THE RULE OF LENITY REQUIRE REVERSAL OF THE CONVICTIONS.

POINT V—THE COURT MISCONSTRUED *N.J.S.A.* 2C:2–11 IN DENYING DEFENDANTS' MOTION TO DISMISS.

We affirm and dissolve our stay of license suspensions.

Defendants are members of the Chai Project, a non-profit corporation organized to promote community health by preventing the spread of AIDS/HIV and transmission among intravenous drug users through drug counseling, encouragement to enter comprehensive drug programs and the exchange of clean needles and syringes for dirty ones. It began operating in New Brunswick in January 1994, and is affiliated with two clinical programs at Rutgers University. The project has been funded by private donations and small foundation grants, and has received an $80,-000 grant from the United States Conference of Mayors.

The Chai Project protocol for needle exchange is to give a participant seven syringes and exchange dirty syringes for clean ones on a one-for-one basis. The project then takes basic information from the participant and encourages drug treatment programs. From 1994 through mid–1997, the exchange rate of clean syringes to used syringes increased from 7.1 percent to 87 percent.[1] At all relevant times defendant McCague was aware that state law made possession or distribution of a hypodermic syringe or needle a disorderly person's offense.

The New Brunswick Police Department knew of the Chai Project and its needle exchange program in October 1994. McCague, the founder and executive director of Chai, met with Chief Michael Beltranena and explained the program. Chief Beltranena testified that he did not tell McCague to stop the needle exchange program or threaten her with arrest if she continued. In fact he told a local newspaper that the Chai Project's goals were "quite admirable" and that the program workers did not have "criminal intent." However, he testified that these comments represented his personal opinion and described the policy of the New Brunswick Police Department as one of "zero tolerance."

By April 1996, members of Chai became aware of heightened scrutiny by law enforcement, and as a result McCague prepared the following letter to be handed to Chai Project participants:

> As you may know, project has been getting some attention from the Attorney General's office, resulting in our being scrutinized by local law enforcement. At least one of our participants has been questioned recently by an "undercover" officer.
>
> In the 18 months since the NBPD has been aware of the activities of the Chai Project, police officers on the street have been willing to "look the other way." That may be changing.
>
> We need your help.

---

[1] In 1994, the project distributed approximately 2,000 clean syringes and took in 150 used ones. This ratio rose steadily through May 1997. At that time, the project had distributed approximately 20,000 syringes and had taken in 17,500 for the year.

1) Please must [sic] keep in mind that when you exchange sets with us, we are all breaking the law. From the time you step into the van, you can be charged for syringe possession. Until the current situation is resolved, we advise that you treat contact with us as though you are copping a bag. Keep an eye out at all times. Be wary as you leave the site. Get to a safe place as quickly as possible.

2) Help us watch for police while we are all at the site. We need you to give us some of your time to stand at a distance from the van and keep us apprised of anything that seems suspicious.

3) Let us know if you or anyone you know is charged by the police for syringe possession. It is particularly important for us to know if people are being picked up within an hour or two of having contact with us.

4) Let us know if you or anyone you know is questioned by the police regarding the activities of the Chai Project/Needle Exchange.

5) Rather than waiting to see us at the van, give us a call and set up an appointment to exchange at home or somewhere else that feels safe to you.

Your health and safety are of the utmost importance to us. If we have to get arrested, we will do everything we can to make sure that you don't get arrested with us. Your choice to participate in needle exchange is a responsible one. We will always support you in your desire to be healthy and safe.

On April 18, 1996, the project's van was parked on Neilson Street in New Brunswick. An undercover officer, Detective George Green of the Middlesex County Prosecutor's Office, approached McCague and asked if she had a "kit" available. She handed Green the warning letter and a short time later went to the van and obtained a brown paper bag from defendant Scozzare. She gave the bag to Green, and it contained seven hypodermic needles and syringes, one "tie-off" (a rubber tourniquet), five "cookers," four bottles of bleach, four bottles of water and an instruction sheet. Investigator Marshall of the New Brunswick Police Department then arrested McCague and Scozzare for violation of *N.J.S.A.* 2C:36–6. Upon entering the van, Marshall observed and recovered numerous needles and syringes.

Defendants moved before the Middlesex County Assignment Judge for dismissal of the disorderly persons complaints on *de minimis* infractions under *N.J.S.A.* 2C:2–11, as well as constitutional grounds. Judge Longhi issued a written opinion denying the motion and directing that the matter proceed to trial. We denied leave to appeal.

At trial in the New Brunswick Municipal Court the State's witnesses set forth the circumstances of defendants' arrest. Testifying on her own behalf, McCague conceded that when she gave the items to Green she knew she was breaking the law. She added that a few weeks after her arrest she resumed needle exchange and continued doing so up to the time of trial.

Defendants produced several expert witnesses. Dr. Ernest Drucker, a Professor of Epidemiology and Social Medicine and Director of Community Health at Montifiore Medical Center in the Bronx, testified regarding the relationship between drug use and the spread of AIDS. He stated that intravenous drug use is a major cause of the epidemic, and that studies have shown that needle exchange programs dramatically reduce the spread of AIDS. According to Drucker, had needle exchange programs been operating in the United States at the same level as in a number of other countries, some ten to twenty thousand cases of AIDS could have been prevented in 1996 and 1997. He added that there was no indication of an increase in drug use corresponding with institution of needle exchange programs; rather, such programs often serve as a gateway or bridge for drug addicts to enter into treatment.

Dr. Donald De Jarley, Professor of Epidemiology at Albert Einstein College of Medicine, Professor of Psychiatry at Columbus University and Director of Research for the Chemical Dependency Institute at Beth Israel Medical Center in New York City, reported that the most recent studies indicate that approximately half of all new AIDS cases in the United States are occurring among intravenous drug users, with another twenty percent being the sexual partners of intravenous drug users. He added that New Jersey has the highest proportion of AIDS cases associated with drug injection. He further testified that studies of those cities and counties in the United States that have implemented needle exchange programs indicate that a well-implemented program will reduce the transmission of AIDS anywhere from thirty to seventy

percent along with reducing the spread of hepatitis without an increase in overall drug use.

Dr. Frederick Rodgers, a Professor of Psychology at Rutgers University, referred to a New Haven, Connecticut needle exchange program that led to twenty percent of the participants entering drug treatment. He added that the studies he had read suggest either no change or a slight reduction in the incidence of drug use in the area where needle exchange programs have been implemented, and that such programs help reduce the spread of AIDS.

The municipal court judge found both defendants guilty and imposed upon each defendant the minimum sentence of a $500 Drug Enforcement Demand Reduction Fund penalty, a $50 lab fee, $75 Safe Streets assessment, a $50 Violent Crimes Compensation Board assessment, $30 court costs and the mandatory suspension of each defendant's driver's license for six months. Fines and suspensions were stayed pending appeal. The Law Division judge affirmed the convictions and penalties.

The relevant statute under which defendants have been convicted reads as follows:

> *Possession or Distribution of a Hypodermic Syringe or Needle.* Except as otherwise authorized by law[2], it shall be unlawful for a person to have under his control or possess with intent to use a hypodermic syringe, hypodermic needle or any other instrument adapted for the use of a controlled dangerous substance or a controlled dangerous substance analog as defined in chapter 35 of this title or to sell, furnish or give to any person such syringe, needle or instrument. Any person who violates this section is guilty of a disorderly persons offense.
>
> [*N.J.S.A.* 2C:36–6.][3]

---

[2] The "[e]xcept as otherwise authorized by law" terminology refers to *N.J.S.A.* 24:21–51, which provides that no person shall sell or give hypodermic syringes or needles to any person, other than certain designated medical professionals, without a prescription of a duly licensed physician, dentist or veterinarian, or possess such items without a prescription unless a designated medical professional.

[3] The genesis of *N.J.S.A.* 2C:36–6 and the proscription against unauthorized control or possession of hypodermic needles in New Jersey, was the now-

■ Defendants first contend that their conviction should be reversed because they did not act with criminal purpose, but rather acted with a lawful and laudable purpose of seeking to save lives by halting the spread of the deadly AIDS virus. However, there is no statutory requirement of an evil purpose in a criminal statute such as *N.J.S.A.* 2C:36–6. The Legislature has the power to impose criminal liability regardless of a defendant's motive or state of mind and has done so here in the effort to combat the scourge of the manufacturing, distribution and use of controlled dangerous substances. *State v. Maldonado,* 137 *N.J.* 536, 551–52, 645 *A.*2d 1165 (1994); *see also State v. Labato,* 7 *N.J.* 137, 149–50, 80 *A.*2d 617 (1951); *State v. Pelleteri,* 294 *N.J.Super.* 330, 335, 683 *A.*2d 555 (App.Div.1996), *certif. denied,* 148 *N.J.* 461, 690 *A.*2d 609 (1997). As stated in *Morss v. Forbes,*

> [w]ithin reasonable limitations, the Legislature has the power and the right to designate the mere doing of an act as a crime, even in the absence of the *mens rea* which was a necessary prerequisite at common law ... Where words clearly indicating the requirement of a criminal intent are omitted, the issue becomes one of statutory construction to ascertain the meaning of the legislative body.... We should not, however, confuse intent with motive. Proof of motive is never essential to a conviction but may be evidential ... If it were otherwise, the administration of criminal law would become chaotic, since the prosecution would be compelled to analyze the psyche of each defendant and to prove that, in fact, it was malignant.
>
> The ordinary inquiry is whether the act condemned was committed with full knowledge of the facts, in a conscious and purposeful manner, without legal justification of excuse.... The accused must intend to act in the way proscribed by the statute, but it is immaterial that he does not know or believe his conduct violates the law....
>
> *When, with a clear knowledge of all the facts, one deliberately and intentionally does an act in violation of a positive law, cognizant of its existence, he cannot be excused on the basis that his animating desire was essentially praiseworthy.*
>
> [24 *N.J.* 341, 358–59, 132 *A.*2d 1 (1957) (citations omitted, emphasis added).]

■ Lack of defined culpability in a criminal statute is not a prerequisite to its enforcement, and assertions of good motive or

---

repealed *N.J.S.A.* 2A:170–77.1, as enacted by *L.* 1952, *c.* 209, § 1. That statute was recodified in 1980 as *N.J.S.A.* 24:21–51. *N.J.S.A.* 2C:36–6, while a new statute, is essentially complementary to the provisions contained in *N.J.S.A.* 24:21–51, which also is a disorderly persons offense. *See* Cannel, *Criminal Code Annotated,* comment on *N.J.S.A.* 2C:36–1 to –6 (1997–98).

humanitarian concern, whether genuinely believed or self-serving, do not vitiate a state specifying actions constituting criminal conduct. *Maldonado, supra,* 137 *N.J.* at 555, 645 *A.*2d 1165. *Mens rea* is not a constitutional prerequisite as long as fundamental justice is not offended such as when the conduct proscribed was so blameless as to trap the unknowing or unwary. *Ibid. See also Lambert v. People of State of California,* 355 *U.S.* 225, 228–30, 78 *S.Ct.* 240, 242–44, 2 *L.Ed.*2d 228, 231–32 (1957).

The clear command of *N.J.S.A.* 2C:36–6 renders the conduct unlawful. *See State v. Schrier,* 30 *N.J.* 241, 244, 152 *A.*2d 578 (1959). The record establishes that defendants were acutely aware that they were violating the law, and McCague admittedly prepared and distributed to users of the needle exchange program a flyer warning them to beware of an intensified police presence. Therefore, the convictions based on the evidence adduced were legally proper and factually sufficient beyond a reasonable doubt.

Defendants next contend that their convictions should be reversed because their actions were justified by "medical necessity," pursuant to *N.J.S.A.* 2C:3–2a, which reads as follows:

Conduct which would otherwise be an offense is justifiable by reasons of necessity to the extent permitted by law and as to which neither the code nor other statutory law defining the offense provides exceptions or defenses dealing with the specific situation involved and a legislative purpose to exclude the justification claim does not otherwise plainly appear.

In the case at bar, defendants' conduct is not permitted by law but specifically defined as criminal under *N.J.S.A.* 2C:36–6. Other statutory provisions provide exceptions from the prohibition of distribution of hypodermic needles and syringes by designated medical professions. And the challenged statutory prohibition was enacted in its present form as part of a clear and comprehensive legislative attack on the distribution, possession and use of controlled dangerous substances and associated paraphernalia. *Maldonado, supra,* 137 *N.J.* at 551, 645 *A.*2d 1165; *State v. Tate,* 102 *N.J.* 64, 69, 505 *A.*2d 941 (1986); *State v. Sorge,* 249 *N.J.Super.* 144, 147–52, 591 *A.*2d 1382 (1991). Therefore, the statutory

limiting criteria of *N.J.S.A.* 2C:3–2c renders the defense of medical necessity inapplicable to the facts of this case.

We do not deem *People v. Bordowitz,* 155 *Misc.*2d 128, 588 *N.Y.S.2d* 507 (N.Y.Crim.Ct.1991), a New York trial court decision relied upon by defendants, to be of precedential value. In fact, that trial judge specifically distinguished a needle exchange from a case where needles or syringes were actually being distributed, and contrasted the applicable New York statute with the comprehensive New Jersey drug legislation described in *Tate.*

More on point is *Commonwealth v. Leno, 415 Mass. 835, 616 N.E.*2d 453 (1993). There, in a similar fact pattern with a similar statutory prohibition, the Massachusetts Supreme Judicial Court held that there was no entitlement to a jury instruction on defense of justification by necessity, stating in pertinent part that,

> the prevention of possible future harm does not excuse a current systematic violation of the law in anticipation of the eventual over-all benefit to the public.
> [*Id.* 616 *N.E.*2d at 456.]

Defendants in this case were not confronted with a clear and imminent danger to themselves or others. Moreover, the present facts did not involve needle exchange but a distribution of "works," consisting of seven hypodermic needles together with a "tie off" and five "cookers," all paraphernalia to assist in the injection of controlled dangerous substances. Undercover officer Green did not submit any dirty needles, and there is no proof in the record that he claimed to be a drug addict or that he was in medical need of the equipment offered. We conclude that the defense of necessity was inapplicable under the factual and legal complex *sub judice.*

With respect to defendants' contention that the enforcement of *N.J.S.A.* 2C:36–6 as applied constitutes a violation of the exchange participants' right to life under the United States and New Jersey Constitutions, defendants' standing to raise the issue on behalf of participants who receive hypodermic needles through the Chai Project is not challenged. *See Griswold v. Connecticut,* 381 *U.S.* 479, 481, 85 *S.Ct.* 1678, 1680, 14 *L.Ed.*2d 510, 512–13 (1965); *New*

*Jersey Citizen Action v. Riviera Motel Corporation*, 296 *N.J.Super.* 402, 415, 686 *A.*2d 1265 (App.Div.1997), *appeal dismissed*, 152 *N.J.* 361, 704 *A.*2d 1297 (1998). However, the argument lacks merit.

 A constitutional right is one which is fundamental and rooted in the traditions and collective consciences of the American people, *Griswold, supra*, 381 *U.S.* at 493, 85 *S.Ct.* at 1686, 14 *L.Ed.*2d at 520; *Snyder v. Massachusetts*, 291 *U.S.* 97, 105, 54 *S.Ct.* 330, 332, 78 *L.Ed.* 674, 677 (1934). There is no fundamental right to obtain a disinfected needle to inject heroin or any other prohibited substance. *See State v. Nugent*, 125 *N.J.Super.* 528, 534, 312 *A.*2d 158 (App.Div.1973) (possession of marijuana or hashish not a fundamental right); *cf. United States v. Posters 'n' Things, Ltd.*, 969 *F.*2d 652, 659 (8th Cir.1992) (federal statute prohibiting the sale of drug paraphernalia held not to threaten or inhibit the exercise of constitutionally protected rights), *aff'd*, 511 *U.S.* 513, 114 *S.Ct.* 1747, 128 *L.Ed.*2d 539 (1994). A constitutionally protected "right to life" does not encompass the use of prohibited substances at a reduced health risk.

 Meritless as well is the argument that defendants were deprived of due process by their prosecution. Whatever the prior statements of the New Brunswick Chief of Police, defendants were not immune to enforcement of the law, and their prosecution for a clear violation of *N.J.S.A.* 2C:36–6 cannot in any sense be considered violative of fundamental fairness or shocking to a sense of justice. *State v. Laganella*, 144 *N.J.Super.* 268, 279–80, 365 *A.*2d 224 (App.Div.), *appeal dismissed*, 74 *N.J.* 256, 377 *A.*2d 652 (N.J.1976). Nor is laches appropriate in criminal prosecutions where the safety and welfare of the community are of paramount importance. *State v. Tully*, 148 *N.J.Super.* 558, 564, 372 *A.*2d 1323 (App.Div.), *certif. denied*, 75 *N.J.* 9, 379 *A.*2d 240 (1977). Defendants were keenly aware of the prospect of arrest and prosecution for violating the criminal statute.

■ Defendants' contention that the rule of lenity requires reversal of their convictions is a misapplication of the doctrine that a statute of ambiguous meaning should be construed to provide the most lenient interpretation and penalty. *United States v. Shabani*, 513 *U.S.* 10, 17, 115 *S.Ct.* 382, 386, 130 *L.Ed.*2d 225, 231 (1994); *Liparota v. United States*, 471 *U.S.* 419, 427, 105 *S.Ct.* 2084, 2089, 85 *L.Ed.*2d 434, 441 (1985). *N.J.S.A.* 2C:36–6 is unambiguous; the defendants had fair notice of the activity proscribed and they received a minimum sentence.

■ Respecting defendants' contention of error in the denial of their pretrial motion to dismiss the complaints as *de minimis* infractions of the law, *N.J.S.A.* 2C:2–11, we agree with Judge Longhi that defendants' possession and distribution of hypodermic needles was a "clear violation" of *N.J.S.A.* 2C:36–6 and that it was not *de minimis*. The same result was reached on similar facts in *Sorge, supra,* 249 *N.J.Super.* at 145, 591 *A.*2d 1382, where defendants were also committed to the distribution of clean hypodermic needles to intravenous drug users in exchange for dirty needles. In that case, Judge D'Italia noted that the *de minimis* statute has as its touchstone the prevention of absurd application of the Criminal Code, and "[t]here is nothing absurd about the application of *N.J.S.A.* 2C:36–6 to these defendants. Neither can their conduct be deemed trivial." *Id.* at 148, 591 *A.*2d 1382. In language equally applicable to this case he added,

> [d]efendants, albeit for the highest motives, were engaged in facilitating illegal drug use. Whatever social benefits may have attended defendants' plan in terms of minimizing the transmission of HIV in the community, defendants were exacerbating the social costs associated with the illegal drug trade. That is contrary to the zero tolerance drug policy of this State which refuses to treat as trivial the possession of even the minuscule amounts of a controlled dangerous substance ...

> Moreover, defendants' conduct is not a mere technical violation, an isolated transgression, such that no deterrent purpose is served by their prosecution or conviction. On the contrary, defendants' conduct was intended to postulate a test case, the grant of defendants' motion constituting a declaratory judgment exempting needle exchange programs from the application of *N.J.S.A.* 2C:36–6. A determination in defendants' favor would amount to a judicial license for defendants and others to embark on a course of conduct with significant law enforcement and public health implications.

[*Id.* at 148–49, 591 *A.*2d 1382.]

Defendants argue that the medical evidence over the past seven years as illustrated by their expert testimony establishes the public health efficacy and necessity of the needle exchange program. However, the benefits of such programs remain a matter for debate. *See generally,* David J. Merrill, *Compassion for Drug Addicts or Government–Sanctioned Drug Use?: An Overview of the Needle Exchange Controversy,* 23 *Pepp. L.Rev.* 939 (1996). In the New Jersey Legislature, bills have been introduced in both the Senate and Assembly to authorize the distribution of hypodermic needles under the control or supervision of applicable state authorities. None has been enacted.

The impact of the AIDS virus, the manner of its transference, its impact of epidemic proportion in certain areas of our State and the tragic specter of children born infected has occasioned controversy concerning the medical, social and moral problems associated with intravenous drug use. However, the zero tolerance for the distribution of drugs and drug paraphernalia established by the Comprehensive Drug Reform Act leaves no room for the creation of exceptions by judicial decree. Any change respecting the prohibition of *N.J.S.A.* 2C:36–6 is solely for legislative consideration.

Affirmed.