645 A.2d 1165

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
LUCY MALDONADO, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
CARLOS RODRIGUEZ, DEFENDANT–APPELLANT.

Argued October 13, 1992—Decided August 1, 1994.

540

*Claudia Van Wyk*, Deputy Public Defender II, argued the cause for appellants (*Zulima V. Farber*, Public Defender, attorney).

*Robin Parker*, Deputy Atty. Gen., argued the cause for respondent in *State v. Lucy Maldonado* (*Robert J. Del Tufo*, Atty. Gen. of New Jersey, attorney).

*Chana Barron*, Deputy Atty. Gen., argued the cause for respondent in *State v. Carlos Rodriguez* (*Robert J. Del Tufo*, Atty. Gen. of New Jersey, attorney).

PER CURIAM.

Defendants in these two cases challenge the constitutionality of that portion of the Comprehensive Drug Reform Act of 1986 (the Act) that imposes strict criminal liability on manufacturers and distributors of certain controlled dangerous substances (CDS)

when death results from the ingestion of the CDSs. *N.J.S.A.* 2C:35–9. A defendant convicted of distribution or manufacturing is subject to second or third-degree punishment, but if a person dies from ingestion of those CDSs then the defendant is guilty of a first-degree offense. Conviction under the drug death statute requires only that but for the ingestion the death would not have occurred, no matter how "innocent" defendant might otherwise be, if the State can also prove that the death was neither too remote from the defendant's actions nor too dependent on another's conduct to make the conviction unjust.

*N.J.S.A.* 2C:35–9 (section 9) reads as follows:

a. Any person who manufactures, distributes or dispenses methamphetamine, lysergic acid diethylamide, phencyclidine or any other controlled dangerous substance classified in Schedules I or II, or any controlled substance analog thereof, in violation of subsection a. of *N.J.S.* 2C:35–5, is strictly liable for a death which results from the injection, inhalation or ingestion of that substance, and is guilty of a crime of the first degree.

b. The provisions of *N.J.S.* 2C:2–3 (governing the causal relationship between conduct and result) shall not apply in a prosecution under this section. For purposes of this offense, the defendant's act of manufacturing, distributing or dispensing a substance is the cause of a death when:

(1) The injection, inhalation or ingestion of the substance is an antecedent but for which the death would not have occurred; and

(2) The death was not:

(a) too remote in its occurrence as to have a just bearing on the defendant's liability; or

(b) too dependent upon conduct of another person which was unrelated to the injection, inhalation or ingestion of the substance or its effect as to have a just bearing on the defendant's liability.

c. It shall not be a defense to a prosecution under this section that the decedent contributed to his own death by his purposeful, knowing, reckless or negligent injection, inhalation or ingestion of the substance, or by his consenting to the administration of the substance by another.

d. Nothing in this section shall be construed to preclude or limit any prosecution for homicide. Notwithstanding the provisions of *N.J.S.* 2C:1–8 or any other provision of law, a conviction arising under this section shall not merge with a conviction for leader of narcotics trafficking network, maintaining or operating a controlled dangerous substance production facility, or for unlawfully manufacturing, distributing, dispensing or possessing with intent to manufacture, distribute or dispense the controlled dangerous substance or controlled substance analog which resulted in the death.

In *Maldonado,* the only question is the constitutionality of section 9, the Court having limited its grant of certification to that issue, 127 *N.J.* 564, 606 *A.*2d 374 (1992). In *Rodriguez,* in which we likewise granted certification, 130 *N.J.* 11, 611 *A.*2d 650 (1992), in addition to the issue of constitutionality, we must decide claims of error concerning the charge and the sentence.

We find section 9 to be constitutional in all respects, and affirm the judgments of the Appellate Division in both cases.

I

*Maldonado* is a straightforward drug distribution and strict-liability-death case. Lucy Maldonado obtained heroin for her friend Larry Dunka on May 7, 1988 as an accommodation—she made no profit. Larry's brother John accompanied him in making the purchase and participated in the use of the heroin. After the purchase Larry and John took the heroin to another location where Larry injected some of it into his own arm and then into John's arm. When John came to the next morning, he found Larry on the floor dead. Maldonado was prosecuted for various offenses including violation of section 9, to which she pleaded guilty, reserving, however, her right to appeal on constitutional grounds. She was sentenced to a term of imprisonment of fifteen years, with a parole ineligibility term of seven years. The Appellate Division affirmed the conviction and upheld the constitutionality of section 9 in an unpublished opinion. The court relied on *State v. Ervin,* 242 *N.J.Super.* 584, 577 *A.*2d 1273 (App.Div.), *certif. denied,* 122 *N.J.* 400, 585 *A.*2d 399 (1990), and rejected an attack, not raised in *Ervin,* that section 9 "violates due process because it reaches unduly remote results" and is "unconstitutionally vague."

In *Rodriguez,* defendant distributed cocaine to Fred Bennett. Present were Susan Hendricks, defendant's girlfriend, and another man who had accompanied Bennett to defendant's apartment. The cocaine had been weighed and bagged when the police broke into the apartment. In an attempt to hide the evidence, Hendricks and Bennett each swallowed a plastic bag containing co-

caine. Within minutes of the police entry, Hendricks collapsed in convulsions on the floor. Emergency medical workers were summoned and, with Bennett looking on, they attempted to resuscitate her. While the medical workers attempted to revive Hendricks, they specifically asked whether anyone else had swallowed drugs. Bennett responded that he had not. Approximately a half hour later, Bennett also went into convulsions and died at the scene. Hendricks subsequently died at the hospital. Rodriguez was charged with violating section 9 for Bennett's death only.

A jury convicted Rodriguez for violating section 9 and for other offenses. On the section 9 count the court sentenced him to an eighteen-year term. The court merged the counts for possession and possession with intent to distribute into the distribution count, for which he was sentenced to a five-year term. On the school zone count he was sentenced to a term of four years subject to a three-year parole disqualification. The three sentences were to run consecutively. On appeal the Appellate Division upheld the constitutionality of section 9, affirmed the convictions, merged the distribution conviction into the school zone conviction, and ordered that the sentences for the school zone conviction and the drug death conviction run concurrently.

In addition to sustaining the constitutionality of section 9, the Appellate Division rejected Rodriguez's claims that the death was too remote as a matter of law, that the charge did not adequately explain his factual claims of remoteness, and, in any event, that it improperly placed the burden of proof on defendant. In sustaining section 9's constitutionality the court, as it did in *Maldonado,* relied also on our decision in *State v. Martin,* 119 *N.J.* 2, 573 *A.*2d 1359 (1990), in which we imported a remoteness factor into felony-murder jurisprudence. *Id.* at 31–33, 573 *A.*2d 1359. The court also rejected defendant's contention that his school distribution conviction should merge into the section 9 conviction.

## II

Defendants' constitutional arguments are essentially the same, requiring no differentiation of the two cases except for the special

circumstances surrounding the death in *Rodriguez,* which require some additional discussion of the remoteness issue. The challenge asserts that section 9 is facially unconstitutional because the strict liability aspect of section 9 deprives the defendants of due process of law, and inflicts cruel and unusual punishment, and the "not too remote" element is unconstitutionally vague and unfair. Defendants rely on the Federal and State Constitutions, although no differentiation is suggested by either defendant.

A.

*The Due Process Claim—Lack of Mens Rea*

Although recognizing the Legislature's power to impose criminal liability regardless of a defendant's state of mind, or put differently, regardless of culpability, defendants contend that such power is constitutionally limited, is ordinarily applied only to regulatory offenses, and in any event is not a power that encompasses the enactment of section 9.

Section 9 eliminates *mens rea* (criminal intent), in that a defendant is culpable for the underlying distribution offense but no culpability is required for the deadly result. A defendant is guilty whether the defendant intends the death or has absolutely no idea that it may occur. Criminal liability under section 9, therefore, is similar to liability for felony murder, *N.J.S.A.* 2C:11–3(a)(3). *See* Assembly Judiciary Committee, *Commentary to the Comprehensive Drug Act* 24 (1987) [hereinafter *Commentary* ] (drawing comparison between liability under section 9 and felony-murder statute). A person is liable for felony murder if a death occurs in the commission of a felony notwithstanding that the felon did not purposely, knowingly, recklessly or negligently cause the death. *Martin, supra,* 119 *N.J.* at 28, 573 *A.*2d 1359 (concluding that felony murder is absolute-liability offense). Similarly, under section 9, a defendant will be criminally liable in the first degree for a death caused by the defendant's distribution of a CDS even if

the defendant did not purposely, knowingly, recklessly, or negligently cause the death.

The conceptual framework of defendants' arguments rests in part on the assertion that as the punishment for the offense becomes greater, including more extensive terms of imprisonment, legislative power to impose strict liability becomes constitutionally diminished until it reaches a point at which imposition is prohibited. Applying that concept, defendants emphasize the section's imposition of a potential twenty-year term of imprisonment for what would otherwise be a third or second-degree crime with maximum imprisonment of five or ten years, when according to their argument, a defendant may be totally blameless in a moral sense for the death that occurred. A defendant may have had no reason to believe any death might occur, nor intended, expected, or been able to foresee any such outcome, having merely distributed a small amount of a substance that, the distributor believed, is almost invariably used without harm for social purposes.

The law in this area is well-settled to the contrary. "The legislatures have always been allowed wide freedom to determine the extent to which moral culpability should be a prerequisite to conviction of a crime." *Powell v. Texas*, 392 *U.S.* 514, 545, 88 *S.Ct.* 2145, 2160, 20 *L.Ed.*2d 1254, 1274 (1968) (Black, J., concurring). As our Court of Errors and Appeals held over one hundred years ago, "Nothing in the law is more incontestable than that, with respect to statutory offenses, the maxim that crime proceeds only from a criminal mind does not universally apply." *Halsted v. State*, 41 *N.J.L.* 552, 589 (E. & A. 1879). Although the justifications may differ, case after case, almost without exception, has upheld the power of the states to impose strict criminal liability not only in a regulatory setting but for serious offenses as well. *United States v. Balint*, 258 *U.S.* 250, 254, 42 *S.Ct.* 301, 303, 66 *L.Ed.* 604, 606 (1922) (upholding constitutionality of statute prohibiting sale of illegal drugs that lacked *mens rea* element); *United States v. Holland*, 810 *F.*2d 1215, 1222–24 (D.C.Cir.1987) (upholding constitutionality of statute prohibiting sale of drugs

near school zone regardless of defendant's knowledge of school's location); *United States v. Engler,* 806 *F.*2d 425, 436 (3rd Cir. 1986), *cert. denied,* 481 *U.S.* 1019, 107 *S.Ct.* 1900, 95 *L.Ed.*2d 506 (1987) (upholding constitutionality of strict liability provision of Migratory Bird Treaty Act); *Guam v. Root,* 524 *F.*2d 195, 197–98 (9th Cir.1975), *cert. denied,* 423 *U.S.* 1076, 96 *S.Ct.* 861, 47 *L.Ed.*2d 86 (1976) (upholding constitutionality of felony-murder statute); *Brown v. State,* 448 *N.E.*2d 10, 15 (Ind.1983) (upholding constitutionality of strict liability felony-murder statute). *But see State v. Guest,* 583 *P.*2d 836, 839–40 (Alaska 1978) (holding that defendant could not be convicted of statutory rape if he had reasonable belief that victim was of age; proof of intent is constitutional requirement for serious offenses).

Treatment of the felony-murder rule also illustrates the power of the states to create strict liability crimes. The ancient rule was created apart from any constitutional considerations and has been bombarded by intense criticism and constitutional attack. *People v. Aaron,* 409 *Mich.* 672, 299 *N.W.*2d 304, 327–29 (1980) (concluding that original justifications for felony-murder rule no longer exist today); *State v. Price,* 104 N.M. 703, 726 *P.*2d 857, 859 (Ct.App.1986) (criticizing doctrine as "result-oriented"); Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 72, at 560–61 (1972) (criticizing doctrine as unjustified and predicting its obsolescence); Nelson E. Roth & Scott E. Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Crossroads,* 70 *Cornell L.Rev.* 446 (1985) (arguing that felony-murder rule violates Due Process and Cruel and Unusual Punishment Clauses of Federal Constitution); W.E. Shipley, Annotation, *Judicial Abrogation of the Felony Murder Doctrine,* 13 *A.L.R.*4th 1226 (1982).

Nonetheless, the rule has survived more or less intact and still thrives today. Thus, its continued vitality is a strong indicator of states' power to impose strict criminal liability. *See Lockett v. Ohio,* 438 *U.S.* 586, 602, 98 *S.Ct.* 2954, 2963–64, 57 *L.Ed.*2d 973, 988 (1978) (plurality opinion) ("That States have authority ... to enact felony-murder statutes is beyond constitutional challenge.").

That felony murder is today almost invariably found in statutory form further demonstrates its resistance to constitutional challenge. *E.g., N.J.S.A.* 2C:11–3(a)(3); *Ala.Code* § 13A–6–2 (1993); *Cal.Penal Code* § 189 (West 1994); *N.Y.Penal Law* § 125.25 (McKinney 1994).

Indeed, directly contrary to defendants' bedrock assertion, the cases show that the Constitution places a lesser burden on the states to justify strict liability for serious criminal offenses than for regulatory offenses. Absolute liability for regulatory offenses traditionally finds justification in administrative convenience, the need to deter through the most effective forms of prosecution, dispensing with proof of intent, and imposing relatively minor punishment, all adding up to a conclusion that whatever injustice results from strict liability is more than counterbalanced by benefit to the public. *E.g., State v. Hatch,* 64 *N.J.* 179, 184–85, 313 *A.*2d 797 (1973) (upholding constitutionality of gun control statute without *mens rea* element as applied to both state residents and nonresidents); *United States v. Greenbaum,* 138 *F.*2d 437, 438 (3rd Cir.1943) (upholding constitutionality of statute prohibiting transportation of adulterated food without requiring knowledge or wrongful intent); *Ex parte Marley,* 29 *Cal.*2d 525, 175 *P.*2d 832, 835 (1946) (upholding constitutionality of statute prohibiting sale of commodity at false weight regardless of seller's intent); *People v. Travers,* 52 *Cal.App.*3d 111, 124 *Cal.Rptr.* 728, 730 (1975) (upholding constitutionality of statute prohibiting sale of mislabelled motor oil regardless of seller's intent); *People v. Brown,* 98 *Ill.*2d 374, 75 *Ill.Dec.* 216, 457 *N.E.*2d 6, 9 (1983) (upholding constitutionality of statute prohibiting possession of motor vehicles with falsified or removed identification numbers without *mens rea* element); *State v. Baltimore and Susquehanna Steam Co.,* 13 *Md.* 181, 187 (1857) (upholding conviction for transporting slave without consent of owner regardless of carrier's knowledge that slave was on board); *Hobbs v. Winchester Corp.,* 2 *K.B.* 471, 483–85 (C.A.1910) (upholding conviction of butcher for selling unsound meat regardless of butcher's actual or constructive knowledge). *See generally* Frances B. Sayre, *Public Welfare Offenses,* 33

*Colum.L.Rev.* 55 (1933) (chronicling growth of and justifications for regulatory offenses). While similar reasoning may be found in some of the cases imposing strict liability for serious criminal offenses involving substantial terms of imprisonment, the overwhelming majority of them make clear that such justifications are not essential, that the legislature's rational conclusion that the safety of the public requires such draconian measures is enough. *E.g., Holland, supra,* 810 *F.*2d at 1223 (upholding constitutionality of statutes prohibiting sale of drugs near school regardless of defendant's knowledge of school's location); *State v. Celaya,* 135 *Ariz.* 248, 255, 660 *P.*2d 849, 856 (1983) (upholding constitutionality of felony-murder statute); *State v. Goodseal,* 220 *Kan.* 487, 553 *P.*2d 279, 286 (1976) (same); *People v. Benson,* 125 *Misc.*2d 843, 480 *N.Y.S.*2d 811, 814 (Sup.Ct.1984) (same); *State v. Hermann,* 164 Wis.2d 269, 474 *N.W.*2d 906, 912 (App.), *review denied,* 477 *N.W.*2d 286 (1991) (upholding constitutionality of statute enhancing punishment for drug sale near school property, without requiring proof of scienter). The usual rationale is that the added deterrence of strict liability is all the justification that is needed in view of the serious threat to public safety posed by the conduct prohibited by those laws. In the case of felony murder, although the constitutional analysis follows long after its origin, that justification notes the increased risk of homicide during felonies and the need therefore to deter such conduct.[1] *Goodseal, supra,* 553 *P.*2d at 286.

 Here the justification is even stronger: not only is the risk of death clearly present when drugs such as heroin and cocaine are distributed, but the conduct sought to be deterred—illegal drug manufacture and drug distribution—is also widely regarded as constituting the most substantial threat to public safety that

---

[1] While this Court has never passed on the issue, courts of this State have regularly assumed the validity of such a law. *Ervin, supra,* 242 *N.J.Super.* at 588, 577 *A.*2d 1273.

now exists.[2] Society has targeted drug distribution that causes death for enhanced punishment to protect the safety of the public. This judgment is for the Legislature to make. All that is needed is a "conceivable rational basis" for their conclusion that such added deterrent effect is warranted to protect society. *Town of Secaucus v. Hudson County Bd. of Taxation,* 133 *N.J.* 482, 494–95, 628 *A.*2d 288 (1993), *cert. den.,* —— *U.S.* ——, 114 *S.Ct.* 1050, 127 *L.Ed.*2d 372 (1994). But in this case more than conceivable rationality is present, for the facts and figures irrefutably support that conclusion. Nationally, in 1986, the year prior to the enactment of the drug death statute, more than 37,000 people suffered drug-related deaths. Bureau of Justice Assistance, U.S. Department of Justice, *Report on Drug Control* 26 (1987). Many of these deaths can be traced to the illegal drug trade, which is the "most widespread and lucrative organized crime activity in the United States." President's Commission on Organized Crime, *America's Habit: Drug Abuse, Drug Trafficking and Organized Crime* 6 (1986). Statistics regarding New Jersey's drug trade sound even louder alarms. The Attorney General at the time of the Act's passage reported that "[a]pproximately fifty percent of all crimes prosecuted in New Jersey are drug related. At least one-third of all crimes in this state, including violent crime and thefts, are committed by persons who are under the influence of alcohol or illicit substances." W. Cary Edwards, *An Overview of the Comprehensive Drug Reform Act of 1987* [sic], 13 *Seton Hall Legis.J.*

---

[2] The intense concern and severe intent of the Legislature are demonstrated not only by the elimination of the *mens rea* element in section 9, but also by other provisions in the Act that have similar effect. See *N.J.S.A.* 2C:35–6 (precluding defense to crime of use of minor in manufacture or distribution of drugs that defendant was mistaken about minor's age); *N.J.S.A.* 2C:35–7 (precluding defense to crime of possession with intent to distribute near school property that defendant was unaware of proximity to school); *N.J.S.A.* 2C:35–8 (precluding consideration of defendant's knowledge in imposition of enhanced punishment for distribution of drugs to pregnant women and minors); *N.J.S.A.* 2C:35–11(c) (precluding defense to crimes involving imitation CDS that defendant mistakenly believed substance to be genuine CDS).

5, 9 (1989) (citing statistics compiled by Office of Attorney General).

As for the effectiveness of strict liability imposed by a law such as section 9, the same standard applies, and we must conclude that a rational justification exists for the legislative determination that it will help. *See State v. Ivory*, 124 *N.J.* 582, 592–95, 592 *A.*2d 205 (1991) (upholding statute enhancing punishment for drug distribution within one thousand feet of school property regardless of defendant's knowledge, because it "presents a rational and reasonable approach by the Legislature to reduce drugs around schools").

Practically all of the state decisions conform to this point of view. A sampling of cases considering the constitutionality of felony-murder statutes that do not require proof of intent to commit the homicidal act exemplify the rule. The Kansas Supreme Court upheld that state's felony-murder rule, after noting that it is "designed to protect human life," because the state's legislative "enactments in such areas are not to be judicially curtailed where they reasonably relate to the ends sought to be attained." *Goodseal, supra*, 553 *P.*2d at 286. The Arizona Supreme Court quoted *Goodseal* to make the same point. See *Celaya, supra*, 135 *Ariz.* at 255, 660 *P.*2d at 856. A New York Supreme Court decision follows the same pattern, holding that "[i]t is for the Legislature and not for the courts to determine the proper elements of felony murder." *Benson, supra*, 480 *N.Y.S.*2d at 814. These cases illustrate the rule followed in almost all jurisdictions that a state can justify imposition of strict liability for a serious criminal offense merely by suggesting a rational basis to support the legislative determination that the added deterrence of strict liability punishment represents a reasonable approach.

Only cases from Alaska appear to diverge from the overwhelming majority view. The Alaska Supreme Court has regularly held that proof of *mens rea* is required in order to impose criminal punishment. *E.g., Guest, supra*, 583 *P.*2d at 838; *Spiedel v. State*, 460 *P.*2d 77, 78 (1969).

In New Jersey we have upheld the constitutionality of criminal convictions under statutes imposing strict criminal liability in a variety of circumstances in which some might call the defendant, at least in a limited sense, "blameless." In *State v. Fearick,* 69 *N.J.* 32, 350 *A.*2d 227 (1976), a driver with a suspended driver's license was subject to mandatory imprisonment for being involved in an accident resulting in personal injury, even though the accident was not caused by any fault of the driver. In *Ivory, supra,* a drug dealer riding his bicycle near a public park was subject to enhanced punishment under a statute regulating possession of drugs within 1000 feet of a school with intent to distribute even though the State did not prove that the dealer intended to sell drugs near school property, even though the State did not prove the dealer knew the park was "school property," and even though the park, owned by a parochial school, was leased to the city and regularly used for general recreational purposes. 124 *N.J.* at 592–95, 592 *A.*2d 205. In *State v. Hatch,* 64 *N.J.* 179, 313 *A.*2d 797 (1973), we held that a Massachusetts resident driving through New Jersey on his way to Pennsylvania could be convicted of violating this State's gun control statutes requiring a "firearm purchaser identification card" and requiring that firearms be transported in a securely closed package, notwithstanding that the driver had a Massachusetts firearm identification card, was carrying his hunting rifle and shotgun in a manner permitted in his home state, and was unaware that he was subject to additional legal requirements while passing through New Jersey. Those cases, in addition to the implicit validation of the felony-murder rule itself, see *Martin, supra,* 119 *N.J.* 2, 573 *A.*2d 1359, support the conclusion that the absence of a *mens rea* element in section 9 does not violate due process.

The federal experience is no different. The Supreme Court has made clear that no constitutional problem arises when Congress decides that public safety requires criminalization of conduct without proof of *mens rea.* See *United States v. Freed,* 401 *U.S.* 601, 609–10, 91 *S.Ct.* 1112, 1117–18, 28 *L.Ed.*2d 356, 363–64 (1971) (upholding constitutionality of gun control statute without element

of intent or knowledge). *Holland, supra,* is close to home; the federal statute used to punish a drug distributor apprehended near school property without proof of the defendant's knowledge survived constitutional scrutiny because it was "amply supported" by "Congress's heightened interest in protecting children from both the indirect and the direct perils of drug traffic...." 810 *F.*2d at 1222–24. Similarly, because of Congress's "power to delete the requirement of scienter where the statute deals with ... safety," a federal government inspector who accepts a bribe may constitutionally face felony punishment even without proof of intent to accept the bribe. *United States v. Mullens,* 583 *F.*2d 134, 138 (5th Cir.1978). In addition, the federal criminal RICO statute has been upheld against constitutional challenge despite its failure to require scienter or knowledge because "it is clearly within Congressional power to create a strict liability offense which dispenses with any element of 'intent.'" *United States v. Boffa,* 513 *F.Supp.* 444, 464 (D.Del.1980).

 The Federal and State cases stand for the ultimate proposition that the State has the power to define a crime without proof of *mens rea* so long as the definition does not offend fundamental notions of justice. Thus, constitutional-due-process limitations on strict-liability criminal statutes apply when the underlying conduct is so passive, so unworthy of blame, that the persons violating the proscription would have no notice that they were breaking the law. *Lambert v. California,* 355 *U.S.* 225, 228–30, 78 *S.Ct.* 240, 242–44, 2 *L.Ed.*2d 228, 231–32 (1957) (invalidating municipal ordinance criminalizing act of convicted felon remaining in Los Angeles more than five days without registering with City). Illegal drug distribution obviously does not fit that exception.

 The ultimate constitutional underpinning for defendants' argument, regardless of the weight of precedent, is that to impose such a penalty—twenty years imprisonment—simply because of a result that defendant had no idea was possible, not only "cuts across the grain of criminal law," *Martin, supra,* 119 *N.J.* at 20, 573 *A.*2d 1359, but also strikes at the very root of that system, for

it is alleged to be fundamentally unfair and wholly unjust. Even if it *is* unfair or unjust in some situations, it does not come anywhere near the point of invoking constitutional due process limits on what would otherwise be clear legislative power. Drug distribution puts the entire society at risk. More important than the societal interest, however, the defendant can and should be held to the knowledge of the dangerousness of his or her activity, can and should be held to the knowledge that death may result, can and should be held to the knowledge that the law will impose severe punishment if death does result, regardless of its unlikelihood and the defendant's lack of criminal intent with respect to the death. To the extent moral culpability is a desirable element of a criminal offense (it is certainly not constitutionally required), it is inextricably embedded in the drug death statute. These considerations far overpower any degree of injustice that may result from the application of section 9.

The only significant area where the rule is different is in capital punishment jurisprudence where imposing the death penalty for a strict liability crime such as felony murder may violate the Eighth Amendment. *Enmund v. Florida*, 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982); see *infra* at 560–561, 645 *A.*2d at 1176–1177. But other than cases of capital punishment, the weight of authority clearly supports the legislative power to create that criminal liability for selected offenses.

For those reasons we reject this aspect of defendants' due process claims.

### B.

#### *Cruel and Unusual Punishment*

■ The State and Federal Constitutions require a three part inquiry in determining whether a punishment is unconstitutionally cruel and unusual:

First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense?

> Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective?
>
> [*State v. Ramseur*, 106 *N.J.* 123, 169, 524 *A.*2d 188 (1987).]

See *Coker v. Georgia*, 433 *U.S.* 584, 592, 97 *S.Ct.* 2861, 2866, 53 *L.Ed.*2d 982, 989 (1977) (plurality opinion); *Solem v. Helm*, 463 *U.S.* 277, 103 *S.Ct.* 3001, 77 *L.Ed.*2d 637 (1983). *But see Harmelin v. Michigan*, 501 *U.S.* 957, 961–995, 111 *S.Ct.* 2680, 2684–2701, 115 *L.Ed.*2d 836, 843–64 (1991) (opinion of Scalia, J.) (arguing that Eighth Amendment does not require proportional punishments).

Defendants argue that section 9 fails the first and second of these tests. They claim that punishment under section 9 is inconsistent with contemporary standards of decency and that section 9 inflicts a disproportionate punishment because it enhances a defendant's punishment on the basis of fortuitous events that do not reflect the defendant's culpability.

■ A comparison of statutes from this state and from other jurisdictions indicates that section 9 is consistent with contemporary standards of decency. With respect to the quantum and nature of the punishment imposed by section 9, it merely imposes first degree punishment on the defendant. Thus, the defendant is subject to the same punishment as numerous other first degree offenders. Moreover, at least thirteen other jurisdictions have enacted statutes that, like section 9, impose strict criminal liability for a death resulting from the distribution or manufacturing of drugs, indicating that section 9 is not out of step with current norms. *Colo.Rev.Stat.Ann.* § 18–3–102(1)(e) (West 1994); *Conn. Gen.Stat.Ann.* § 53a–54b(6) (West 1994); *Del.Code Ann.* tit. 16, § 4751(b) (West 1993); *Fla.Stat.Ann.* § 782.04(1)(a)(3) (West 1993); *Ill.Ann.Stat.* ch. 720, para. 5/9–3.3 (Smith–Hurd 1994); *La.Rev.Stat.Ann.* § 14:30.1(A)(3) (West 1993); *Minn.Stat.Ann.* § 609.195(b) (West 1993); *Nev.Rev.Stat.Ann.* § 453.333, 200.010 (Michie 1993); *N.H.Rev.Stat.Ann.* § 318–B:26(IX) (1993); *Pa.Stat. Ann.* tit. 18, § 2506 (1993); *R.I.Gen.Laws* § 11–23–6 (1993) (applying only to death of minor); *Wash.Rev.Code.* § 69.50.415 (1993); *Wis.Stat.Ann.* § 940.02(2) (West 1993). Most of these impose as severe punishment as does section 9, or more severe. Indeed, two

States make a defendant convicted under their drug death statutes subject to the death penalty, *Conn.Gen.Stat.Ann.* § 53a–54b(6) (West 1994); *Fla.Stat.Ann.* § 782.04(1)(a)(3) (West 1993), and two other states impose life imprisonment on defendants convicted under their drug death statutes. *La.Rev.Stat.Ann.* § 14:30.1(B) (West 1993) (mandating life imprisonment at hard labor); *N.H.Rev.Stat.Ann.* § 318–B:26(IX) (1993) (imposing up to life imprisonment).

Furthermore, as we have noted *supra* at 552, 645 *A*.2d at 1172, section 9 is but one weapon in the arsenal society is using to fight its war on the socially debilitating effects of drug abuse. Given the strength and virtual unanimity of society's conviction to eradicate drug abuse, we are confident that "contemporary standards of decency" tolerate, if not mandate, stern punishment of drug manufacturers and distributors whose drugs prove deadly. We note that the United States Supreme Court has recently upheld the constitutionality of life imprisonment for possession of cocaine. *Harmelin, supra,* 501 *U.S.* at 995–97, 111 *S.Ct.* at 2702, 115 *L.Ed.*2d at 865. If a life sentence for mere possession of cocaine is constitutional, then a ten to twenty year sentence for a death caused by the defendant's distribution or manufacturing of a CDS is beyond reproach. *See also State v. Burch,* 545 *So.*2d 279, 284–85 (Fla.Dist.Ct.App.1989) (holding that statute imposing up to 30 years imprisonment for distribution of cocaine within 1000 feet of a school does not "shock the conscience" or violate Eighth Amendment), *aff'd,* 558 *So.*2d 1 (Fla.1990).

■■■ Defendants also argue that section 9 fails the proportionality test because it punishes the defendant for events that are out of the defendant's control and thus do not reflect the defendant's culpability. Defendants contend that the differential of punishment between two equally innocent defendants because of what appears to be the happenstance of death is so arbitrary and unfair as to constitute cruel and unusual punishment. But obviously the same can be said for any strict liability criminal statute, including felony murder, because all of them contain the seeds of differential

treatment based on result and regardless of state of mind. Added penalties based on result are common in the criminal law and they have never been thought to create constitutional violations of Cruel and Unusual Punishment Clause. As the United States Supreme Court has stated:

> [T]he assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in determining the elements of the offense and determining the appropriate punishment. Thus, two equally blameworthy criminal defendants may be guilty of different offenses solely because their acts cause differing amounts of harm.
>
> [*Payne v. Tennessee*, 501 *U.S.* 808, 819, 111 *S.Ct.* 2597, 2605, 115 *L.Ed.*2d 720, 731 (1991).]

The argument is not made any stronger by noting the potential for this difference based on what are alleged to be extremely remote consequences, a death resulting after numerous redistributions of the initial sale. Putting aside the safety valve of the remoteness requirement that might result in acquittal, the straightforward response is that all that is involved is perhaps a greater degree of unfairness as the death becomes more and more remote, but nothing qualitatively different from the unfairness inherent whenever two equally innocent or equally culpable defendants are treated substantially differently because of the result.

We know of no case holding that a statute imposing strict criminal liability constitutes cruel and unusual punishment. Although the state of the law is less than settled, the authorities are virtually unanimous in rejecting this kind of claim under these circumstances. For instance, courts interpreting the felony-murder rule as a strict liability crime consistently maintain that it does not constitute cruel and unusual punishment. *State v. West*, 176 *Ariz.* 432, 445, 862 *P.*2d 192, 205 (1993); *People v. Rose*, 182 *Cal.App.*3d 813, 227 *Cal.Rptr.* 570, 574 (1986); *Goodseal, supra*, 553 *P.*2d at 286. *But see* Roth & Sundby, *supra* at 478–85 (arguing that felony-murder rule violates Eighth Amendment's prohibition of disproportionate punishments). Similarly, statutory rape laws that impose strict criminal liability have been found not to violate the Eighth Amendment. *E.g., Commonwealth v. Moore*, 359 *Mass.* 509, 269 *N.E.*2d 636, 640 (1971). Courts have reached

the same conclusion regarding statutes enhancing the punishment for distribution of drugs when the distribution occurs within a certain range of school property and they do so without regard to whether the drug distributor knew of the school's proximity. *E.g., Commonwealth v. Alvarez,* 413 *Mass.* 224, 596 *N.E.*2d 325, 330–31 (1992).

Indeed, the only area of Eighth Amendment jurisprudence in which the strict liability feature of a criminal sanction appears to have any significance is capital punishment. There, more stringent standards are necessary because the death penalty, due to its "unusual severity . . . is in a class by itself." *Furman v. Georgia,* 408 *U.S.* 238, 289, 92 *S.Ct.* 2726, 2752, 33 *L.Ed.*2d 346, 378 (1972) (Brennan, J., concurring). In *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), we held that the "cruel and unusual punishments" clause of our state constitution did not permit imposing the death penalty on a defendant who did not intend to kill anyone but had been convicted of capital murder for purposely or knowingly inflicting serious bodily injury resulting in death. *Id.* at 89, 549 *A.*2d 792. Instead, we determined that the only conduct that would justify the death penalty is purposeful or knowing murder.[3] *Ibid.* Similarly, in *Enmund, supra,* the United States Supreme Court held that without some connection with the murder other than his mere presence at the scene, a defendant could not be sentenced to death under the felony-murder rule. 458 *U.S.* at 800–01, 102 *S.Ct.* at 3378–79, 73 *L.Ed.*2d at 1154. *But cf. Tison v. Arizona,* 481 *U.S.* 137, 158, 107 *S.Ct.* 1676, 1688, 95 *L.Ed.*2d 127, 145 (1987) (upholding death sentences for defendants convicted of felony murder who lacked intent to kill but played major role in commission of felony and acted with reckless indifference to human life).

---

[3] A 1992 amendment to *N.J. Const.* art. 1, ¶ 12, aimed at our decision in *Gerald,* provides that imposing the death penalty on a defendant convicted of knowingly causing serious bodily injury resulting in death does not, under certain circumstances, constitute cruel and unusual punishment.

Related to defendants' argument that the potentially different treatment results in cruel and unusual punishment is their claim concerning the fundamental unfairness of the punishment regardless of differences. The difference simply makes it even worse. That claim is based on the asserted unlikelihood of death resulting from ordinary drug distribution. No figures are presented on which anyone could rely, although defense counsel speculated that far fewer than one tenth of one percent of all drug distribution transactions result in death, and that the comparable figure for robberies is one percent. The posited conclusion, not only that this offense is distinguishable because of that greater unlikelihood from felony murder, is that it is grossly unfair and constitutes cruel and unusual punishment.

In response, we initially note that under the felony-murder statute, the convicted felon, when death results, receives a thirty-year term without parole eligibility, but that under section 9 the presumptive term is fifteen years, with parole eligibility likely to occur after three. Thus, one convicted of felony-murder faces a much more substantial sentence than one convicted under section 9. Putting that comparison aside, however, legislatures are not bound by any such statistical analysis. It is enough to find that there is a substantial risk of death, that deaths do occur, 37,000 "drug related deaths" in 1986 alone, U.S. Department of Justice, *Report on Drug Control: Implementation of the Anti–Drug Act of 1986*, at 26 (1987), and that the conduct deterred by this allegedly grossly unfair punishment seriously threatens the social fabric. We do not mean to imply that a statistical showing will always be irrelevant in this area, but when applied to section 9 and the evils involved, it is almost irrelevant here, especially in view of the fact that a significant number of deaths do result.

## C.

*Due Process: Vagueness of the "Not Too Remote" Requirement*

The strongest component of defendants' constitutional attack is their argument that section 9 is unconstitutionally vague. Specifi-

cally, defendants argue that the element that the death be not too remote is impermissibly vague, rendering section 9 unconstitutional.

"Clear and comprehensible legislation is a fundamental prerequisite of due process." *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 118, 462 *A.*2d 573 (1983). Legislative enactments, civil or criminal, are void as violating due process if they are "so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Ibid.* (quoting *Connally v. General Constr. Co.,* 269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L.Ed.* 322, 328 (1926)).

The prohibition against vague laws serves two independent goals. First, vague laws are prohibited because they fail to give adequate notice that certain conduct will put the actor at risk of liability. "Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford,* 408 *U.S.* 104, 108, 92 *S.Ct.* 2294, 2299, 33 *L.Ed.*2d 222 (1972). Second, vague laws create an unacceptable danger of arbitrary and discriminatory enforcement of the law because they fail to provide those charged with enforcing the law—prosecutors, judges and juries—with sufficiently precise standards. *Ibid.* Because of the greater penalties in criminal statutes, courts subject criminal laws to sharper vagueness scrutiny than they do civil laws. *State v. Afanador,* 134 *N.J.* 162, 170, 631 *A.*2d 946 (1993).

The vagueness charge here does not relate to the first aspect of the doctrine. Necessarily, no drug distributor will be influenced in his conduct, or be able to shape his conduct to conform to the statute since by definition the distributor has no control over the regulated results. No matter how precisely the remoteness factor were defined, no drug distributor could conform his conduct to assure compliance because the law would still punish unintended and unforeseen deaths, even if it were more narrowly circumscribed. A different definition might make a defendant more or less willing not to distribute drugs at all, but that is not the aspect of vagueness that is referred to when it is claimed that vagueness

prevents defendants from conforming their conduct to the law. Even if defendants did challenge that aspect of vagueness, and argued that had they fully understood their conduct created the potential for enhanced criminal liability they would have desisted entirely, that claim would be rebutted by the underlying premise of their actual argument that section 9 creates almost limitless liability. Thus, our "vagueness" analysis focuses on the risk of arbitrary or discriminatory enforcement of section 9.

A statute may be challenged as either facially vague or vague "as-applied." *State v. Cameron*, 100 *N.J.* 586, 593, 498 *A.*2d 1217 (1985). A statute is facially vague only if it is vague in all its applications, while a statute is vague as applied only if it is vague when applied to the circumstances of a specific case. *Ibid.* Therefore, if a statute is not vague when applied to a certain case, the statute will survive a vagueness challenge despite the fact that it may be vague in other applications. *Id.* at 593–94, 498 *A.*2d 1217.

The part of section 9 said to be unconstitutionally vague provides that a defendant shall not be convicted unless the State proves beyond a reasonable doubt that the resulting death was "not too remote in its occurrence" and "not too dependent upon conduct of another person ... as to have a just bearing on the defendant[s'] liability." *N.J.S.A.* 2C:35–9b. In both these cases we can fairly say that whatever doubts or vagueness might otherwise arise because of the indefiniteness of the remoteness element, they are not present here. Putting aside for the moment the victim's conduct, no case could be more direct than these two or more certain in the absence of any conceivable definition of remoteness: Maldonado provided heroin to Dunka, he died from the ingestion; Rodriguez provided cocaine to Bennett, he died from the ingestion. Therefore, because the remoteness element is not vague as applied to the two sets of circumstances presented here, defendants' vagueness challenges fail even though the statute may be vague in other applications. However, given the importance of the matter and the probable recurrence of the

contention, we choose to deal with the possible vagueness of section 9's "not too remote" element in other applications. We hold on the basis of sound policy that the "not too remote" element survives the facial vagueness challenge here and all vague as-applied claims in this case.

First, we note that the "not too remote" element is found in many other areas of the criminal law; thus, a finding that the "not too remote" element is vague would have consequences reaching far beyond section 9. Substantially similar remoteness exculpation is found in our construction of the felony-murder statute; *Martin, supra,* 119 *N.J.* at 32, 573 *A.2d* 1359, and, potentially at least, in every single offense defined by the Code because, under certain circumstances, whether the offense requires knowing, purposeful, reckless, or negligent conduct, the similar remoteness element may come into play. See *N.J.S.A.* 2C:2–3b, c (defining causation for most criminal offenses). The remoteness element protects the defendant in all of these cases, but whether constitutionally required or not, like any other element its vagueness could result in invalidity. Thus, if defendants are correct and section 9's "not too remote" element is unconstitutionally vague, then, necessarily, the felony-murder rule and the general causation elements found in *N.J.S.A.* 2C:2–3b, c would also be unconstitutional.

The adoption of the remoteness element by the Legislature and by this Court in these two most important applications,—one affecting practically every offense under the Code and the other affecting felony murder—is just a most practical and important judgment on the part of all branches of government on the desirability and ultimate fairness of the remoteness exculpation, quite inconsistent with notions of unconstitutional vagueness. That is not enough, however, for as far as we know the provisions have never been judicially tested either here or elsewhere. Some analogous cases exist, however, but ultimately we sustain the requirement against this challenge on grounds of sound policy and the inherent limitation of language when applied to the circumstances that "remoteness" was intended to address.

We concede the basic correctness of defendants' initial contention: exculpation of defendants on the ground that the result for which they would otherwise be liable was too remote to make such liability just is indefinite, indeed considerably so. If the remoteness is expressed in terms of the expiration of time between the act and the result, how long must it be before it is remote; if in terms of space, how far in order to be remote; if in terms of cause and effect, how many other and what kind of causes must there be; and if in terms of difference from what was intended, how much and in what ways must the actual result differ from what was intended? Despite the indefiniteness of the remoteness limitation on liability, however, fairness seems to require some such limitation on a defendant's liability. Thus, a problem arises: how do we limit criminal liability so that defendants are not unjustly punished without creating an intolerable amount of vagueness.

Two simple examples will provide a sense of the problem. In the felony-murder context, the example often given is that of the bank robber who is charged with causing the death of the teller who pressed the alarm button on the bank robber's entry and, because of defective wiring, was electrocuted in the process. *Model Penal Code* § 2.03 comment 4 (1985). Under felony-murder analysis the robber would be guilty of murder unless some provision allowed the jury to exonerate him for deaths that were so unexpected, unanticipated, so unlikely to occur in the ordinary course of events as to be characterized as too remote to have a "just bearing" on his criminal responsibility. Another example, in a murder context, is the example of the defendant who fired his rifle at the victim, then riding a horse, intending to kill her, but missed; the victim ultimately died as a result of the shot when the horse bolted and ran away, fatally injuring the rider. *Model Penal Code* § 2.03 comment 2 (1985).

The possibilities of such adventitious outcomes, not simply in these clear terms of unusual occurrences but of lengthy causation sequences, not necessarily strange, but unusually extended, with concurrent and contributing causes, are limitless. Our strong

"sense of justice" requires us to consider the remoteness of such adventitious outcomes when determining criminal liability, but our inability to express what feature of unusual or extended causal chains affects our sense of justice makes developing a precise and definite standard that will accommodate our sense of justice difficult, and we have found none better than the "too remote to have a just bearing" standard. Correcting the indefiniteness of the language so that it will be more definite when applied to the bank alarm or horse bolting cases will leave us with a solution that is unsatisfactory for innumerable other cases. Whether the context is a drug death prosecution, a felony-murder prosecution, or prosecution for any crime in which the remoteness aspects of causation come into play under *N.J.S.A.* 2C:2–3b or c, no clear answer exists. The only practical standard is the jury's sense of justice.

The drafters of the Model Penal Code resolved the conflict between the desirability of limiting criminal liability for results otherwise falling within the law's prohibition but whose occurrence was so far from the ordinary or expectable as to leave doubt about the justice of imposing such liability, and the impossibility of fashioning language to define the extent of such limitation in a way to assure acceptably consistent application by adopting the "too remote to have a just bearing" language. *Model Penal Code* § 2.03(2)(b), (3)(b) (1985). They apparently agreed on the need for some limitation on criminal liability just as is imposed on civil liability in negligence cases, and they found that the usual method of such limitation—liability only for "proximate" results—was unsatisfactory. *Model Penal Code* § 2.03 comment 4 (Tentative Draft No. 4 1955) (remarking that what is important about proposed causation section is that it "free[s] the law from the encrusted precedents on 'proximate causation,' offering a principle that will permit both courts and juries to begin afresh in facing [causation] problems...."); *see also* New Jersey Criminal Law Revision Commission, 2 *The New Jersey Penal Code* 49 (1971) (noting that proximate cause standard "has presented enormously difficult problems because of the vagueness of the term."). "Natu-

ral" and "probable" and "foreseeable," "substantial factor," all of them, as used, left juries not only a wide area within which to choose an outcome, but truly without substantial guidance in making that choice. "Probable" and "foreseeable" were more definite, but each had its limitations stemming from considerations other than definiteness. "Probable" results might be too restrictive of criminal responsibility, and "foreseeable" results too expansive. In some cases they might work and in others they might not.

The drafters of the Model Penal Code proposed two solutions: 1) the "not too remote" standard, which was ultimately adopted, and 2) a standard that looked to what results the actor knew or should have known were made more probable by the actor's conduct. *Model Penal Code* § 2.03(2)(b), (3)(b) (Tentative Draft No. 4 1955). The Model Penal Code authors rejected the second alternative because it concealed what was really going on in the jury box. *Model Penal Code* § 2.03 comment 3 n. 17 (1985). The authors realized that the remoteness factor was vague and allowed for arbitrary and unequal application. *Ibid.* Despite the vagueness of the "not too remote" standard, however, the authors of the Model Penal Code ultimately decided that it represented the best solution, concluding that what was really involved was a communal determination by a jury about how far criminal responsibility should go in cases of this kind: a community's sense of justice on whether a defendant, otherwise clearly responsible under the criminal law, should be relieved of punishment because the result appeared too distant from his act.

We have lived with such indefiniteness for hundreds of years in the civil law with the formulation of either proximate cause or substantial factor. *See* W. Page Keeton, *et al., Prosser and Keeton on the Law of Torts* § 42, at 273, 278 (5th ed. 1984) (tracing term 'proximate cause' to Lord Chancellor Bacon and locating initial judicial application of substantial factor test in *Anderson v. Minneapolis, St. Paul & Sault Sainte Marie Railway Co.,* 146 *Minn.* 430, 179 *N.W.* 45 (1920)). We have also lived

with the indefiniteness in the area of felony murder although our earlier cases appear to contain an exception to felony-murder responsibility under formulations similar to "proximate cause." *State v. Canola*, 135 *N.J.Super.* 224, 235, 343 *A.*2d 110 (App.Div. 1975), *rev'd*, 73 *N.J.* 206, 374 *A.*2d 20 (1977); *State v. Burton*, 130 *N.J.Super.* 174, 180, 325 *A.*2d 856 (Law Div.1974). Even today, cases interpreting *Martin* suggest that the actor is responsible under the "too remote" standard only for "proximate consequences." *See Ervin, supra*, 242 *N.J.Super.* at 589–90, 577 *A.*2d 1273.

The question, then, is whether the law can constitutionally accommodate this conflict in what the most learned of our colleagues have concluded is the best way, or whether, because of the indefiniteness involved, the law must abandon the search. If we choose the latter course, we face an intolerable predicament, for we would be forced either to extend criminal responsibility regardless of remoteness, or to confine it restrictively, severely limiting its scope and effectiveness simply to avoid the possibility of arbitrary application. Therefore, we choose the former—the law is constitutional—and we do so as a matter of our own sense of sound policy.

In many, many other areas the law cannot be precise but must be practical. Even in the fashioning of rules of liability, this Court bluntly has acknowledged that its sense of sound policy and justice may be the ultimate touchstone. We have frequently stated that whether a duty to protect another from a danger exists "is ultimately a question of fairness. The inquiry involves a weighing of the relationships of the parties, the nature of the risk and the public interest of the proposed solution." *Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962); *see also Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993) (stating that "[t]he actual imposition of a duty of care and the formulation of standards defining such a duty derive from considerations of public policy and fairness").

This "sense of justice" is clearly involved in many criminal cases. Juries possess not only the unwritten power of nullification,[4] *State v. Ingenito*, 87 *N.J.* 204, 212, 432 *A.*2d 912 (1981), but juries also have the almost-absolute ability to determine life and death in sentencing proceedings under our capital punishment law. *N.J.S.A.* 2C:11-3c. The acknowledged power of jurors, seemingly irrationally, certainly not explicitly rationally, to exercise lenity by not convicting of certain charges when the rest of their verdict may clearly indicate guilt is but another example. *State v. Crisantos*, 102 *N.J.* 265, 272-73, 508 *A.*2d 167 (1986). What other explanation exists for our accommodation of jurors' instincts but our faith in their "sense of justice"? To argue that the benefits of such a rule outweigh its potential detriments, or its actual detriments, is difficult, because some believe that outcomes in criminal cases are wildly unpredictable and that our present system does not afford the consistency that is supposed to be the bedrock of our system of justice. We believe the contrary, but regardless of our belief, we know of no better solution. We realize that given the same set of facts one jury may decide the result is too remote to have a just bearing on defendant's criminal responsibility, and another may not—but the same may be said for almost any submission to juries in criminal cases.

As we said about our acceptance of jury nullification, our trust in juries to understand and apply the "not too remote" element "is indicative of a belief that the jury in a criminal prosecution serves as the conscience of the community and the embodiment of the common sense and feelings reflective of society as a whole." *Ingenito, supra*, 87 *N.J.* at 212, 432 *A.*2d 912 (citing *United States v. Quarles*, 350 *U.S.* 11, 18-19, 76 *S.Ct.* 1, 5-6, 100 *L.Ed.* 8, 15 (1955)). "[A]nd law in the last analysis must reflect the general

---

4 Indeed, the drafters of the Criminal Code included the "not too remote" exculpation factor partly in anticipation of, and as an accommodation to, the urge of jurors to nullify. "The advantage of putting the issue squarely to the jury's sense of justice is that it does not attempt to force a result which the jury may resist." New Jersey Criminal Law Revision Commission, *The New Jersey Penal Code* 361 (1971).

community sense of justice." Sayre, *supra,* 33 *Colum.L.Rev.* at 70.

Defendants appear to argue that the problems of indefiniteness and potentially arbitrary application of the "not too remote" factor are greater in the section 9 setting than in either felony murder or *N.J.S.A.* 2C:2–3b or c settings. If they mean that the issue may arise more frequently, they may be right, but analytically we can determine no difference. Certainly in felony murder the circumstances that may lead to death are potentially just as variable as under the drug death act. As far as *N.J.S.A.* 2C:2–3b and c are concerned, the only difference is that remoteness appears to be measured from a given point: *e.g.,* in the case of a purposeful crime, remoteness is measured by comparing the intended result with the actual result, usually in terms of how the actual result came about as compared to how the defendant thought the intended result would come about. But that difference is more semantic than anything else, for again the variables are infinite. Not only that, but in both felony murder and drug death, the jury will presumably measure remoteness from how these deaths ordinarily occur with how they actually occurred, and in all the examples, including *N.J.S.A.* 2C:2–3, other factors will be considered in determining "just bearing." For instance, we have little doubt that remoteness may save a low-level distributor much more often than it will save the manufacturer or kingpin, either because a jury may sense that a manufacturer or kingpin should contemplate the innumerable transactions and occurrences that may follow the original manufacturer or distribution and ultimately led to death whereas the lower level distributor may not, or because the ultimate culpability of one is deemed greater than the other. *See Model Penal Code* § 2.03 comment 4 (Tentative Draft No. 4 1955) (noting that "juries will not lightly find convictions that will lead to the severest types of sentences unless [their] resentments ... have been aroused"). "Just bearing" allows for consideration of all factors. That is its merit on the side of justice, and its deficit in the expansion of indefiniteness. On balance, we hold that it is constitutional.

D.

*Due Process: Unfairness of "Not Too Remote" Element*

Those same observations regarding a jury's sense of justice may be applied to the contention of defendants—on the unfairness of remoteness, as distinguished from its vagueness—when they note the remoteness issue will rarely be practically available to the low level distributor because ingestion ordinarily follows distribution whereas it will ordinarily be available, theoretically, to the manufacturer and kingpin; it is the "theoretical" difference that suggests unfairness, rather than reality, for we believe that in reality juries will be loathe to acquit on the basis of remoteness when, as, and, if, the prosecutor is able to trace the death dealing drug to the higher level operators.

Even if the State prosecutes only low-level drug dealers, that selection will have no impact on the constitutionality of the statute. The statute is intended to apply to every wrongdoer in the distribution chain.

Defendants also complain that they have been unfairly deprived of their most likely defense. One of the factors that might lead a jury to conclude that the result was too remote to have a just bearing on defendant's guilt is that the result was caused by others—that is, that the actions of others, in addition to defendant's act, significantly contributed to the outcome. In the drug death case, the most obvious action is the action of the victim who intentionally, knowingly, recklessly, or negligently ingested the drugs. Defendants claim that the Act deprives them of the effective use of this intervening cause either as a defense or to prove remoteness. See *N.J.S.A.* 2C:35-9b(2)(b) and (c). While we do not pass on this claim or on the scope and impact of those sections of the Act, see *infra* at 575, 645 *A.*2d at 1184, the partial answer, assuming defendants are correct, is that the Legislature is

competent to provide that under most circumstances [5] the victim's ingestion of the drugs may not be used in any way in opposition to the State's case. If that was the Legislature's intent, it may have been based on the conclusion that allowing such a defense in support of the remoteness contention would have weakened both the protection intended for potential victims and the deterrent effect of the law in general, a law designed not only to protect victims but to protect society. It may have concluded that in the hands of a capable advocate, use of that factor might lead juries to conclude that the victim was sufficiently at fault to absolve the distributor. So while remoteness under the drug death law might not be as broad a defense as it might otherwise be, it still would remain available,[6] and we know of nothing in the law, constitutional or otherwise, that requires the Legislature to allow all factors to be considered, or, put differently, that deprives the Legislature of excluding or diminishing any factor that it believes might, if included, significantly adversely affect the law and its purposes.

## III

For many points made by defendants, our response has included a reference to *Martin, supra.* Those responses have noted the

---

[5] The statute does not preclude a defendant's exculpatory use of a victim's coerced or non-negligent, non-reckless and unknowing ingestion of a CDS to show that the death was "too remote ... to have a just bearing on the defendant's liability." *N.J.S.A.* 2C:35–9b(2)(a). Furthermore, we assume that unknowing ingestion, even if negligent, could be so used.

[6] Imagination can conjure up many such other presumably admissible factors bearing on remoteness, even if not run of the mill, but remoteness is rarely run of the mill. In addition to the obvious cases involving numerous redistributions after a defendant's initial distribution and ingestion at some location far removed both in time and space (*e.g.*, after distribution in New Jersey, ingestion by another person two years later in a foreign country), there will be cases where death has nothing to do with the drug risk such as when the victim burns to death in a fire at a drug house immediately after ingesting a drug and where the victim was in a dangerous location or in the company of potentially violent people, either of which resulted in his or her death but unrelated to his or her intoxicated condition.

similarities between strict liability in both cases and the presumed constitutionality of our formulation of causal remoteness in *Martin*. There we held that in certain felony-murder cases the State must prove that the death is not too remote, accidental in its occurrence, or too dependent on another's volitional act to have a just bearing on defendant's culpability. *Martin, supra*, 119 *N.J.* at 32, 573 *A.*2d 1359.

Defendants correctly point out numerous differences between the remoteness factor in felony murder and the remoteness factor in drug death cases, including especially the elimination of the most significant aspect of remoteness, the volitional act of the victim. We note, however, that the Legislature has also eliminated the most significant potential remoteness factor from felony murder: the volitional act of police officers and others (usually the intended victim of a robbery) in their use of firearms resulting in the death. See *id.* at 24, 573 *A.*2d 1359; *N.J.S.A.* 2C:11–3a(3). The legislative history and our decision in *Martin* make clear that the jury may not in any way consider those factors in determining remoteness in a felony-murder trial. *Martin, supra*, 119 *N.J.* at 32–33, 573 *A.*2d 1359.

Defendants also point out that the deaths of co-felons will not result in felony-murder liability, but we are not sure what the significance of that is. No one has ruled that the section 9 provisions can be triggered by the death of anyone other than the person who ingests the drugs, even though other deaths may result, including that of a "co-felon." Furthermore, the clearest criminal responsibility under felony murder lies with the perpetrator of the homicidal act (*e.g.*, the trigger man in a robbery), who is not only deprived of the defenses available to accomplices but who may very well also not be entitled to any remoteness charge. The defendant, however, in drug death cases, very often the equivalent of the triggerman, will be entitled to such a charge.

The differences between felony murder and the drug death statute that disadvantage defendants in drug death cases are significantly counterbalanced by other considerations. Even if

they were not, however, the limits and extent of the remoteness factor is up to the Legislature, and we perceive no constitutional significance to those differences.

The major complaint of defendants, mentioned below, is that a much greater opportunity for a remoteness argument exists in felony-murder situations. The apparent gravamen of the argument is that with the exclusion of the victim's volitional act as a remoteness factor, juries will be unimpressed with all other factors. That is a result both of a sound legislative determination, one within the Legislature's power, and the jury's sense of what factors have a just bearing on the result—the very heart of the remoteness factor. We note, however, that juries do not readily credit remoteness arguments in felony-murder cases. See, *e.g.*, *State v. McClain*, 263 *N.J.Super.* 488, 623 *A.*2d 280 (App.Div.1993) (involving purse snatcher convicted of felony murder when sixty-nine-year-old victim died seven months after collapse following foot chase of defendant); *State v. Whitted*, 232 *N.J.Super.* 384, 557 *A.*2d 327 (App.Div.1989) (involving burglar convicted of felony murder when sixty-two-year-old victim with severe heart disease died of cardiac failure shortly after burglary); *State v. McKeiver*, 89 *N.J.Super.* 52, 213 *A.*2d 320 (Law Div.1965) (involving armed robber convicted of felony murder when, after defendant had fired shot into tavern ceiling, victim died of fright).

Very few of the arguments mentioned in the *Martin* comparison have any relevance to defendant's major point of vagueness. We do not find that any of these differences impinge significantly on the support that the felony-murder rule and *Martin* lend to our conclusions in this case.

## IV

Defendant Rodriguez objects to the jury charge in his case. His major contention is that the court failed to explain the potential significance of the victim's ingestion of the drugs to avoid prosecution rather than to induce intoxication. Defendant contends that such evidence was critical in rebutting the prosecution's

proof that the death was not too remote. If that evidence were admissible and not submitted to the jury, defendant would clearly be correct. However we find no cause for reversal because the issue was both understood by the jury and in effect submitted to it. Not only was all of the evidence bearing on remoteness on which defendant relies presented to the jury but both defendant and the prosecution argued extensively before the jury on the significance of the victim's intentional ingestion in order to avoid prosecution and his failure to have admitted the ingestion when asked, and his failure to have requested medical personnel on the scene to treat him, even though he saw Hendricks in convulsions on the floor after she ingested some drugs. Counsel presented evidence on the issue and argued it without any intervention from the court or objection from either side. The jury understood, therefore, the court having charged the remoteness issue in terms of the result being too dependent on the conduct of another, that those factors could be considered by them in finding that the State had failed to carry its burden of proof on that issue. The court did nothing in its charge either explicitly or implicitly to direct the jury's attention away from those facts or towards them as relevant to remoteness but those facts and counsels' argument left no doubt on that score. While the trial court did not sufficiently explain the relevance of those factors, the circumstances of the trial highlighted them more than any charge could have. If there was error, it was harmless. *R.* 2:10–2; *Graves v. Church & Dwight Co. Inc.,* 267 *N.J.Super.* 445, 631 *A.*2d 1248 (App.Div. 1993).

We do not decide whether this evidence was admissible. See Section 9(b)(2)(b) (State must prove death was not too dependent upon conduct of another person "which was unrelated to the injection, inhalation or ingestion of the substance or its effect as to have a just bearing on the defendant's liability") and Section 9(c) (not a defense to prosecution under this section that decedent contributed to his death "by his purposeful, knowing, reckless or negligent injection, inhalation or ingestion of the substance"). The State tried the case as if the evidence was admissible and has not

contended otherwise before the Appellate Division or this Court. Neither the prosecution nor the defense briefed or argued the matter.

■ The remoteness issue must always be charged. The statutory language makes it an element of the crime. *Sandstrom v. Montana*, 442 *U.S.* 510, 99 *S.Ct.* 2450, 61 *L.Ed.*2d 39 (1979); *State v. Butler*, 27 *N.J.* 560, 143 *A.*2d 530 (1958). In that submission, however, the court should not only explain the meaning of the remoteness factor but its relationship to the facts.

Rodriguez further argues that the trial court failed properly to instruct the jury consistently with his version of the facts concerning the elements of distribution, remoteness, and "control of another," thereby depriving him of his due process right to a fair trial. Defendant argues that he is entitled to have the jury instructions crafted around the facts of the case rather than simply having the instructions read in an abstract fashion following the language of the statute. In making his argument, Rodriguez relies on *State v. Concepcion*, 111 *N.J.* 373, 545 *A.*2d 119 (1988), and *Martin, supra*, 119 *N.J.* 2, 573 *A.*2d 1359.

In *Concepcion* the trial court improperly charged the jury by relating the law to the facts as presented by the State rather than charging in the alternative where the defendant's and State's version of the facts materially differed. This Court held that when the parties' version of the facts are different, the trial court must instruct the jury that it must make a preliminary finding concerning what occurred before it can reach a correct verdict on the law. 111 *N.J.* at 380, 545 *A.*2d 119. Similarly, this Court found that the charge in *Martin* was improper on the causation element of the crime, because the charge tracked the prosecution's theory of the case. 119 *N.J.* at 15–16, 573 *A.*2d 1359. We held that when a discrepancy exists in the facts both the State and the defendant are entitled to a charge that is consistent with its version of the facts. *Id.* at 16, 573 *A.*2d 1359.

▮ Here, however, defendant Rodriguez failed to present admissible evidence at trial that would give rise to a divergent factual scenario necessitating a charge in the alternative. The trial court charged the jury consistently with the evidence. When addressing the element of distribution the court charged as follows:

> Now, the first element of this offense is that the defendant must distribute a controlled dangerous substance. In this case he must have distributed a controlled dangerous substance to Fred Bennett. In order for you to find that the defendant committed this offense, that is, he distributed the controlled dangerous substance, you will rely upon the law that I have referred to before when I charged to you the law that applies to a distribution of cocaine.

> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

> I remind you again that distribute means to deliver or transfer, actual or constructive, from one person to another of a controlled dangerous substance. The State need not prove that the drugs transferred were exchanged for payment of money or the promise of payment of money, or anything of value.

> Keep in mind that, as I told you earlier, that the State must prove that the defendant acted knowingly or purposely in distributing the cocaine to Fred Bennett—that is, he knew that it was cocaine and intended to distribute or dispense it to Fred Bennett, as I have defined that word, "distribution," to you earlier.

Rodriguez argues that he was the distributee and Bennett the distributor. Rodriguez argues that because that factual scenario is at complete odds with the State's version, the court should have expanded his charge to include his theory that the CDS had been passed from Bennett to Rodriguez. A thorough reading of the record, however, fails to reveal any credible evidence to support Rodriguez's theory. Even assuming that defendant presented sufficient credible evidence at trial for a jury to reach that conclusion, the charge as given allows the jury that latitude. The charge states explicitly that to find against Rodriguez on this element, the State must prove "he knew that it was cocaine and intended to distribute or dispense it to Fred Bennett." If the jury believed that Bennett distributed the CDS to Rodriguez, it could not find Rodriguez guilty of the crime as charged. Under that scenario the court properly charged the jury and made clear that

the State had the burden to prove that Rodriguez had distributed the CDS to Bennett.

As for the remoteness charge, the evidence presented by the prosecution and defense did not differ materially. Two different versions of the facts supporting a remoteness contention were not presented to the jury. The court, therefore, did not have to deal with that problem in its charge.

Rodriguez next argues that the trial court's instructions on the element of remoteness shifted the burden of proof, requiring Rodriguez to prove that the victim's death was too remote rather than having the State prove that the death was not too remote. In a criminal trial the State always bears the burden of proving every element of a crime. *State v. Breakiron*, 108 *N.J.* 591, 612, 532 *A.2d* 199 (1987) (citing *In re Winship*, 397 *U.S.* 358, 90 *S.Ct.* 1068, 25 *L.Ed.2d* 368 (1970)).

In making his argument, Rodriguez relies on *State v. Grunow*, 102 *N.J.* 133, 506 *A.2d* 708 (1986). In *Grunow* the defendant was charged with murder; as part of his defense he argued that the crime had been committed in the heat of passion. The trial court erred in its passion/provocation charge by suggesting that the defendant had the burden to show that he had been "deprived of his self control and under the stress of the provocation that confronted him" at the time he committed the murder. 102 *N.J.* at 144–45, 506 *A.2d* 708.

At issue here are two elements of the crime that the State must prove did not occur: that the death was "not too remote in its occurrence" and that the victim's death was not "too dependent upon conduct of another person." Here, although the elements of the crime are stated in negative terms—"not too remote," and "not too dependent upon conduct of another person"—the trial court, on occasion, charged the jury using positive terms. It did make clear, however, that the State was obligated to prove every element of the crime. After providing the jury with lengthy and

carefully drafted explanations of the elements in question, it repeated the charge to the jury:

> Was the ingestion of the cocaine by the victim an antecedent, that is, a preceding act, but for which he would not have died? If the answer is no, you stop your deliberations. If it's yes, you answer the next question, was the death of the victim too remote in its occurrence to have a just bearing upon the defendant's liability?
>
> If the answer to that is yes, it was too remote, then that's the end of your deliberations.
>
> If your answer is no, it was not too remote in the way that I described earlier, you must answer this next question. Was the death of the victim too dependent upon the control of another person which was unrelated to the ingestion of the cocaine to have an effect or just bearing on the defendant's liability?
>
> Now, if the State proves these elements beyond a reasonable doubt, then you may convict the defendant of this charge. If the State has failed to prove these elements, any one of these elements, beyond a reasonable doubt with regard to this charge, then you must acquit the defendant of these charges.

In determining the propriety of the charge, we must view the charge as a whole. *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973). After reviewing the charge in its entirety, we are confident that the jury must have understood that the State had the burden to prove beyond a reasonable doubt that the death was not too remote nor too dependent on the acts of others, and confident, therefore, that the defendant's due process rights were not contravened.

## V

### A.

*Merger of N.J.S.A. 2C:35–7 with 2C:35–9*

Defendant Rodriguez argues that his conviction for distributing drugs near school property in violation of *N.J.S.A.* 2C:35–7 should be merged with his section 9 drug death conviction. We address this claim now while noting that it is of little practical significance to this defendant.[7]

---

[7] Because we have rejected Rodriguez's challenges to his section 9 conviction, he must serve an eighteen year sentence for that offense. Thus, whether the

The Double Jeopardy Clause of the Federal Constitution prohibits multiple punishments for the same offense. *Grady v. Corbin,* 495 *U.S.* 508, 516, 110 *S.Ct.* 2084, 2090, 109 *L.Ed.*2d 548, 561 (1990). State constitutional protection against double jeopardy is co-extensive with the Federal Constitution. *State v. DeLuca,* 108 *N.J.* 98, 102, 527 *A.*2d 1355 (1987). We recently described the two-step test for determining when multiple punishment violates double jeopardy:

> The first step requires the court to consider whether the legislature intended to impose multiple punishments....
>
> If, however, the legislative intent to allow multiple punishment is not clear, the Court must then apply the test articulated in *Blockburger [v. United States,* 284 *U.S.* 299, 304, 52 *S.Ct.* 180, 182, 76 *L.Ed.* 306, 309 (1932) ], to determine whether the defendant is unconstitutionally faced with multiple punishment for the "same" offense. Under *Blockburger,* two offenses are the same unless "each [offense] requires proof of an additional fact which the other does not." 284 *U.S.* at 304, 52 *S.Ct.* at 182, 76 *L.Ed.* at 309.
>
> [*State v. Dillihay,* 127 *N.J.* 42, 47–48, 601 *A.*2d 1149 (1992) (second alteration in original).]

Turning, thus, to legislative intent, three statutory provisions are potentially relevant to the merger question here. The first two are the specific anti-merger provisions found in the drug death and school zone statutes; the third in the Code of Criminal Justice's general statement of merger principles. Neither specific anti-merger provision precludes merger of the two offenses. *N.J.S.A.* 2C:35–9d provides that notwithstanding the general merger statute, a section 9 conviction "shall not merge with a conviction for ... unlawfully manufacturing, distributing, dispensing or possessing with intent to manufacture, distribute or dispense the" CDS that caused the victim's death.[8] *N.J.S.A.* 2C:35–

---

distribution conviction, which carries maximum five-year term of imprisonment, is merged or not will not affect the date on which Rodriguez will be released.

[8] We note that the Judiciary Committee commentary published after the statute was enacted is to the contrary. *Commentary, supra,* at 24 ("[T]his section explicitly provides that a conviction for this offense does not merge with a conviction for any other distribution offense defined in chapter 35 of Title 2C."). However, although a "contemporaneous expression of legislative understanding

9. The school zone statute prohibits the merger of that offense only into convictions under sections 5 and 6 of the Act.[9] *N.J.S.A.* 2C:35-7; *Dillihay, supra,* 127 *N.J.* at 51, 601 *A.*2d 1149.

Because neither of the specific provisions demonstrate a clear intent to impose multiple punishment, we turn to the Code's general merger statute:

 **a. Prosecution for multiple offenses; limitation on convictions.** When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:

 (1) One offense is included in the other, as defined in subsection d. of this section;

 (2) One offense consists only of a conspiracy or other form of preparation to commit the other;

 (3) Inconsistent findings of fact are required to establish the commission of the offenses; or

 (4) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct. . . .

 \* \* \* \* \* \* \* \*

 **d. Conviction of included offense permitted.** A defendant may be convicted of an offense included in an offense charged whether or not the included offense is an indictable offense. An offense is so included when:

 (1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

 (2) It consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein; or

---

is entitled to considerable weight in ascertaining the intent of the Legislature," *State v. Hammond,* 118 *N.J.* 306, 312, 571 *A.*2d 942 (1990), the commentary is not dispositive as our job is to construe statutes passed by a bicameral Legislature and signed by the Governor, not *post hoc* statements by legislative committees.

 [9] Arguably, the absence of the school zone offense from the list of non-mergeable offenses in section 9, and the absence of section 9 from the list of non-mergeable offenses in section 7, when both statutes were adopted simultaneously as part of the same legislative enactment suggest a legislative intent to prohibit multiple punishment.

(3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.

[*N.J.S.A.* 2C:1-8.]

Applying the general merger statute to Rodriguez's convictions, we conclude it neither prohibits separate punishments for the two offenses nor evinces a clear legislative intent to impose multiple punishments. The statute generally allows conviction for multiple offenses but provides for certain exceptions. *N.J.S.A.* 2C:1-8a. Rodriguez's convictions at issue here do not fall within any of the exceptions. They do not come within the included offense exceptions, *N.J.S.A.* 2C:1-8a(1), because neither offense is included in the other. See *N.J.S.A.* 2C:1-8d. The two offenses require proof of different facts: the school zone offense requires proof that the defendant was within 1000 feet of school property, while the drug death statute does not; the drug death statute requires proof that someone died while the school zone offense does not. *Compare N.J.S.A.* 2C:35-7 *with N.J.S.A.* 2C:35-9. Nor do they involve conspiracy, inconsistent factual findings, or a general-specific prohibition scheme. See *N.J.S.A.* 2C:1-8a(2)-(4).

Because we cannot ascertain legislative intent with certainty from the statutes, we follow the *Dillihay* two-step protocol to the *Blockburger* inquiry: Has Rodriguez been sentenced twice for the same offense? We have already given the answer. Each offense requires proof of an element the other does not. Thus we answer the *Blockburger* question in the negative: multiple punishments in this case does not violate double-jeopardy principles.

This answer comports with the "flexible" analysis found in some of our other cases. *E.g., State v. Davis,* 68 *N.J.* 69, 81, 342 *A.*2d 841 (1975). For example, we can look at whether the offenses are designed to protect the same interests. *State v. Miller,* 108 *N.J.* 112, 116, 527 *A.*2d 1362 (1987). They are not: the school zone statute aims to protect children by "reduc[ing] drugs around school," *Ivory, supra,* 124 *N.J.* at 595, 592 *A.*2d 205, while the drug death statute is more broadly intended to deter "all drug manufac-

turers and dealers" from committing inherently dangerous crimes. *Commentary, supra* at 23.

Imposing two different sentences on defendant Rodriguez does not violate principles of double jeopardy. Neither legislative intent nor constitutional limitations requires that convictions for violation of the school zone statute, *N.J.S.A.* 2C:35–7, and the drug death statute, *N.J.S.A.* 2C:35–9, be merged.

### B.

*Merger of Convictions Under N.J.S.A. 2C:35–5a and 2C:35–9*

▪ Finally, Rodriguez asks this Court to address a question that is concededly moot, to provide guidance for lower courts. That question is whether a *N.J.S.A.* 2C:35–5a conviction, the basic distributing/manufacturing/dispensing offense, should merge with a conviction under section 9. In the interests of judicial economy, and because we are convinced of the answer, we address it.

In the first step of the *Dillihay* analysis we look at legislative intent. Section 9's anti-merger provision explicitly prohibits merger of that offense into a conviction under the basic offense, but that is not the issue raised. That anti-merger provision does not apply to a merger of the generic offense into the basic offense. *See State v. Gonzalez,* 241 *N.J.Super.* 92, 99, 574 *A.2d* 487 (Skillman, J., dissenting) (analyzing school zone anti-merger provision as precluding merger into basic distribution offense, but not the reverse).[10] Whether the Legislature intended to impose multiple punishments is thus unclear.

Hence, we turn to the *Blockburger* test. All the elements of the distribution offense are implicated when a defendant is convicted under the drug death statute. The statute says so on its face. *N.J.S.A.* 2C:35–9a ("Any person who ... in violation of subsection a. of *N.J.S.* 2C:35–5"). We performed a similar analysis and

---

[10] The analysis of Judge Skillman was adopted by this Court in *State v. Gonzalez,* 123 *N.J.* 462, 464, 588 *A.2d* 816 (1991).

reached a similar conclusion in *Dillihay, supra,* when we held that "multiple punishments for related convictions" for the generic distribution offense and the school zone offense "are constitutionally impermissible." 127 *N.J.* at 51, 601 *A.*2d 1149. In the mooted question raised here, double-jeopardy principles would similarly require merger of convictions under *N.J.S.A.* 2C:35–5a and *N.J.S.A.* 2C:35–9 that arise out of the same transaction.

## VI

We reject defendants' various constitutional contentions and sustain the constitutionality of section 9 in that respect. We affirm the judgments of the Appellate Division in all respects and remand *Rodriguez* to the Law Division for resentencing in conformance with our affirmance of the Appellate Division's determination. Last, after considering defendant Rodriguez's mooted sentencing contention, we conclude that a conviction under *N.J.S.A.* 2C:35–5a must merge into a conviction under section 9.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7 in State v. Maldonado.

*Opposed*—None.

*For affirmance and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7 in State v. Rodriguez.

*Opposed*—None.